# HAMMOND v. SULLY.

---

ERRONEOUS INSTRUCTIONS; EFFECT ON VERDICT; EFFECT OF MOTIVE OF
LEGAL ACT.

1. The jury is bound to follow the instructions of the trial judge, and the appellate court must presume that they did so and were governed by them in formulating their verdict, so that if there was vice in the instructions, it inheres in the verdict.

2. The members of the board of directors of a corporation cannot be subjected to punitive damages for passing a legal resolution resulting in no actual damage to the complaining party, upon the sole ground that they were actuated by a malignant purpose in passing the resolution; since the motive of a legal act is immaterial.

No. 3147.   Submitted December 5, 1918.   Decided February 1, 1919.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action of trespass on the case in the nature of a common-law conspiracy.

*Reversed.*

The COURT in the opinion stated the facts as follows:

Daniel J. Sully brought action against John Hays Hammond and six others, wherein he charged that they had entered into a conspiracy for the purpose of injuring certain contractual and conventional rights of his, and that in pursuance of this conspiracy they did certain things which damaged him in the sum of $1,500,000. Two of the defendants were never served with summons, and the others, except Hammond, dismissed out of the action. There was a verdict and judgment in favor of Sully for $30,000.

The record is quite extensive, but we think the salient points may be stated as follows: The National Cotton Improvement Company, with a capital of $1,500,000, owned all the rights in American patents for a cotton gin invented by Willard D. Doremus. These rights formed the chief, if not the sole, assets of the corporation. The stock of the company, except a few shares, was held by John P. Miller in trust for himself, Doremus, and Addison G. Du Bois. On December 28, 1909, Miller, as party of the first part, and Hammond and Sully acting for a syndicate composed of themselves and others, as parties of the second part, entered into a contract wherein it was recited that Miller owned a certain amount of the capital stock of the National Cotton Improvement Company; that the parties of the second part were about to form a corporation

to be known as the General Cotton Securities Company, or by such other name as they might select, for the purpose of holding the "securities of corporations engaged in the ginning, warehousing, and general development of the cotton business," with a capital stock of $7,000,000 common and $3,000,000 preferred stock.

By this contract Miller was to deliver to the parties of the second part $471,200 of the preferred and $967,200 of the common stock of the first-named corporation, and to accept therefor $37,500 in cash, $1,000,000 in common and $1,000,000 in preferred stock of the new corporation; the parties of the second part might transfer the stock received by them from Miller to the new corporation for $3,000,000 at par of its common and $3,000,000 at par of its preferred stock; Miller was to deliver to the parties of the second part the $1,000,000 of preferred stock received by him from the new corporation, to be sold by them so as to net to him the sum of $400,000; and the parties of the second part were to "use their best endeavors to sell $2,000,000" of the new corporation's preferred stock and so much as might be necessary of the common stock thereof as would "net to its treasury the sum of $1,600,000." It was also provided that the parties of the second part "shall be under no personal liability by virtue of" the agreement with respect to the sale of the $1,000,000 of preferred stock for the use of Miller and the $2,000,000 for the use of the new corporation, except to account for the proceeds of the sales. On December 29 Hammond's check for $37,500 was delivered to Miller's attorney.

Soon thereafter the new corporation was formed under the name of the General Cotton Securities Company. For brevity we shall refer to it herein as the securities company.

Sully assuming to act for himself, Hammond and the other members of the syndicate, at once made the securities company a proposition that in consideration of the delivery to him of the $6,000,000 of stock, mentioned in the agreement of December 28, he would "pay it upon demand $1,600,000 without interest, at such times and in such amounts" as it might require.

Immediately thereafter (January 7) a contract was made between Sully and the securities company, embodying his proposition and the company's acceptance thereof.

On January 12, Sully as party of the first part, and Hammond and others, as parties of the second part, made an agreement in which Sully was appointed manager of the syndicate for the purpose of signing agreements for the sale of the stock of the securities company and of paying out moneys received from such sales. This agreement also fixed the price at which the stock should be sold. Prior to this, on January 7, a contract had been made between Sully and his associates with respect to the division of the profits to be realized from the transactions of the syndicate. They were to be divided into three parts, of which Sully should receive one part. It also provided for the payment out of the gross profits of $100,000 to Hammond for the purpose of reimbursing him for expenses theretofore incurred, as well as for any expenses which he might subsequently incur on account of the syndicate. Sully was without financial means.

In February, Hammond accused Sully of having obligated him personally to the payment of the $1,600,000 to the securities company by the agreement of January 7 with that company. This Sully denied.

Sully entered actively upon the work of trying to dispose of the stock. He interested many persons of financial importance, but made no sales until the latter part of September, 1910, when he, acting for himself and assuming to act as the syndicate manager and for the securities company, entered into a contract with S. W. Fordyce of St. Louis, who owned the majority of the stock of the Thomas-Fordyce Manufacturing Company, by which he was to make certain expenditures for the purpose of demonstrating the commercial adaptability of five cotton gins of the Doremus-Fordyce type; and if they were found to be satisfactory to Fordyce the securities company was to deliver to him $250,000 of its preferred stock at $90 per share, and to accept in payment preferred stock of the Thomas-Fordyce Company at a valuation of $100 per share, and also

to pay in cash the outstanding accounts of the Thomas-Fordyce Company in an amount not to exceed $250,000. The contract also recited that all the parties thereto understood the minimum value of the assets of the Thomas-Fordyce Company was $500,000.

A few days afterwards, at a meeting between Sully, Hammond, and others, Sully outlined the Fordyce contract to them, but did not say that the shares of the securities company which he had sold were to be paid for by shares of the Thomas-Fordyce Company stock, or that the securities company was to obligate itself to pay $250,000 of the Thomas-Fordyce Company's debts.

In the early part of October, Sully had an interview with Hammond, in which the latter insisted upon having a further test made of the Doremus gin before a prospectus of the securities company was issued, and offered to pay the expenses of the test up to $10,000. As they were about to separate Sully renewed a request which he had made for $1,500 on his personal account, which Hammond refused. A short time afterwards, but on the same day, Sully informed Hammond that he would issue the prospectus just as soon as he got back to Washington, in order that he might sell stock for the purpose of raising funds, Hammond having refused to advance any more: to which Hammond replied: "If you do, Mr. Sully, I will repudiate you and your prospectus in every newspaper in the country."

The next day Sully wrote to Miller that, in view of Hammond's refusal to advance the money which he had requested, he wished to notify him that he had used his best endeavors to sell the stock, but that, owing to Hammond's failure to co-operate with him, he was unable to do so, and that he would on demand from Miller turn back to the latter, so far as he was able to do, all his rights or interest under the contract of December 28, 1909. Miller, on November 23, accepted the proposition and so notified Sully, and demanded the return to him of the capital stock of the National Cotton Improvement

Company which he, Miller, had delivered to Sully and Hammond under the contract of December 28, 1909.

The same day on which Sully wrote the letter to Miller he tendered his resignation as vice president, general manager, and director of the securities company to Hammond, who was then president of the company.

Sully wrote to Fordyce on November 16 not to give Hammond or anyone representing him any inkling of the terms of the contract between Fordyce and himself.

On the same day on which this letter was written there was a meeting of the board of directors of the securities company, which Sully attended. At this meeting Hammond said to Sully, "You are trying to stick me for $1,600,000," to which Sully replied, "I am not trying to do anything of the kind, and you know better than that;" and further remarked that he had proved to him, Hammond, that there was no liability on the part of the syndicate for the $1,600,000 so long as the members "used good faith." Notwithstanding Sully's assurance, the board at this meeting so changed the minutes of the January meeting as to make it appear that the proposition by Sully which the board had accepted did not obligate either Sully, Hammond, or the other members of the syndicate to pay the $1,600,000 unless they sold the stock.

On November 19, Sully wrote Hammond to the effect that he had changed his position with respect to the latter's liability to the securities company for the $1,600,000, and called upon him to make arrangements to take care of the payment of that sum in case the syndicate was asked for it or any part thereof.

Later he admitted that in October he had been advised by his counsel that he and Hammond were jointly liable for that sum of money to the securities company under the agreement which he, Sully, had made with the company in the previous January.

On November 23, the board of directors of the securities company met again. A quorum of the directors was present, but all the others, including Sully, had notice of the meeting. Hammond presided.

Sully's letter to Miller of October 12, to which reference has already been made, in which he offered to do all in his power to turn back to Miller all rights which he might have under the contract of December 28, was laid before the meeting; also a letter from Hammond to Miller, which was joined in by other members of the syndicate, making substantially the same offer as that made by Sully. Miller stated that he had written to Sully assenting to his proposition of October 12, and then demanded the redelivery to him of the National Cotton Improvement Company's stock which he had placed in the hands of the syndicate under the agreement of December 28. Hammond, on behalf of the syndicate, offered to return to the securities company the stock which the syndicate had received from it for sale, except a few qualifying shares held by the directors of the company. The board accepted the Hammond offer, rescinded the contract of January 7, whereby the syndicate was to purchase the stock of the securities company, accepted a return of all the stock which the company had placed in the hands of the syndicate, directed that it be canceled, and that the stock of the National Cotton Improvement Company be returned to Miller in accordance with his request. Thus all the stock of the securities company which the syndicate was to sell, and from the sale of which Sully and the other members expected to reap a profit, were canceled. But this is what Sully desired to accomplish when on October 12 he said to Miller: "I will, on your demand, proceed as far as I can to turn back to you legally all and any of the rights or interests that I may have under this contract" [of December 28]. Miller during the life of the offer made the demand referred to. The action of the board of directors of the securities company just mentioned enabled the parties to satisfy the demand, and thus what Sully desired, if we are to credit his statement, was brought to pass.

Sully asserts that the resolution passed by the board on November 23 was born of a conspiracy to injure him, and not of a desire to advance the interests of the corporation.

At the close of all the evidence, Hammond moved for a directed verdict, which was overruled.

*Mr. George P. Hoover, Mr. John S. Flannery,* and *Mr. Frederic D. McKenney,* for the appellant, in their brief cited:

*Adler* v. *Fenton,* 24 How. 407; *Bowen* v. *Hall,* L. R. 6 Q. B. Div. 333; *Chambers* v. *Baldwin,* 91 Ky. 121; *Darrow* v. *Briggs,* 261 Mo. 278; *Findley* v. *McAllister,* 113 U. S. 104; *Frazier* v. *Brown,* 12 Ohio St. 294; *Hollinberger* v. *Stewart,* 41 App. D. C. 197; *Jackson* v. *Morgan,* 47 Ind. App. 390; *Jenkins* v. *Fowler,* 24 Pa. 308; *Kimball* v. *Harman,* 34 Md. 411; *Lewis* v. *Corbin,* 195 Mass. 524; *Lincoln* v. *Claflin,* 7 Wall. 132; *O'Callaghan* v. *Cronan,* 121 Mass. 115; *People* v. *Duke,* 44 N. Y. Supp. 336; *Robinson* v. *Van Hooser,* 196 Fed. 623; *Savile* v. *Roberts,* 1 Ld. Raym. 374; *St. Louis Southwestern R. Co.* v. *Thompson,* 102 Tex. 89, 6 L.R.A. 630, 19 Ann. Cas. 125.

*Mr. Thomas M. Gittings* and *Mr. John C. Gittings,* for the appellee, in their brief cited:

*Seville* v. *Roberts,* 1 Ld. Raym. 374; *Wildee* v. *McKee,* 111 Pa. 337; *Van Horn* v. *Van Horn,* 56 N. J. L. 318; *Mogul S. S. Co.* v. *McGregor,* L. R. 21 Q. B. Div. 549; *Nalle* v. *Oyster,* 230 U. S. 163; *Hansen* v. *Nicoll,* 40 App. D. C. 228; 1 Hawk. P. C. chap. 72, § 8; *Doremus* v. *Hammond,* 39 App. D. C. 295; *State* v. *S. O. Co.* 49 Ohio St. 137, 15 L.R.A. 145; *United States* v. *Refrig. Co.* 142 Fed. 247; *Smith* v. *Moore,* 199 Fed. 689; *McCaskill* v. *United States,* 201 U. S. 504; 3 Cook, Corp. p. 663; *Donovan* v. *Purtell,* 216 Ill. 669; *Hollinberger* v. *Stewart,* 41 App. D. C. 197; *Press Pub. Co.* v. *Monroe,* 73 Fed. 201; *Wilson* v. *Vaughan,* 23 Fed. 229; 2 Sutherland, Damages, 3d ed. secs. 1331, 1333; *Gilbert* v. *Kennedy,* 22 Mich. 116.

Mr. Chief Justice S̄ʍʏᴛʜ delivered the opinion of the Court:

The learned trial justice, after a careful review of the evidence, said to the jury: "When we boil this case down to its last analysis, in my opinion, it turns on the motive which induced the action of the board of directors on the 23d of November, 1910, in the passage of the resolution which they adopted." He charged that there was no evidence of actual damage, and that unless the jury found that Hammond and his associates, in the passage of the resolution of November 23, were actuated by a malignant purpose, their verdict must be for the defendant.

The jury was bound to follow these instructions (*Kuhn* v. *Chicago, M. & St. P. R. Co.* 74 Iowa, 137, 140, 37 N. W. 116; *Bartling* v. *Behrends,* 20 Neb. 211, 29 N. W. 472; *Moore* v. *Hinkle,* 151 Ind. 343, 50 N. E. 822), and we must presume that they did so (*Shreveport* v. *Cole,* 129 U. S. 36, 42, 32 L. ed. 589, 591, 9 Sup. Ct. Rep. 210), and were governed by them in formulating their verdict. If there was vice in the instructions it inheres in the verdict. Two questions, then, are presented for solution: (a) May the members of a board of directors under any circumstances be subjected to punitive damages because they voted for a resolution which resulted in no actual damage to the plaintiff? and (b) If so, may they be amerced in damages for passing a perfectly legal resolution if it be found that their motives in doing so were sinister?

Concerning the first question, the authorities are by no means in harmony, as a study of the following will show: 2 Sutherland, Damages, 3d ed. sec. 406, p. 1129; *Hanewacker* v. *Forman,* 152 Ill. 321, 325, 38 N. E. 924; *Kuhn* v. *Chicago, M. & St. P. R. Co.* 74 Iowa, 137, 141, 37 N. W. 116; *Girard* v. *Moore,* 86 Tex. 675, 26 S. W. 945; *Stacy* v. *Portland Pub. Co.* 68 Me. 279, 287; *Wilson* v. *Vaughn,* 23 Fed. 229; *Press Pub. Co.* v. *Monroe,* 51 L.R.A. 353, 19 C. C. A. 429, 38 U. S. App. 410, 73 Fed. 201. But we do not find it necessary to decide the point. Whatever its solution may be, it would appear that in any event there must be proof of a tortious act.

This brings us to the second question. In our view it would be a dangerous doctrine to announce that a party may be punished for doing that which is legal if in the judgment of a jury his motive was unworthy. Neither the diligence of counsel, nor our own researches, have uncovered any authority, either text or decision, which approves such a principle. Nor is it in consonance with reason. The motive of an act, as a general thing, has to do with its ethical value, not with its juristic character, and is immaterial where the act itself is legal. To condemn a legal act because of the motive which inspired it would be to subordinate the legal to the ethical, would be to condition the validity of acts upon the motive which called them into existence. This is not within the province of jurisprudence. Until ethical principles are adopted by the law they lie in a domain apart from the field in which jurisprudence operates. "As long as a man keeps himself within the law by doing no act which violates it, we must leave his motives to Him who searches hearts." *Chambers* v. *Baldwin,* 91 Ky. 121, 11 L.R.A. 545, 34 Am. St. Rep. 165, 15 S. W. 57. This is in harmony with many decisions of the Federal courts. We cite a few: *Evans* v. *Sioux City Service Co.* 206 Fed. 841, 844; *Jacobson* v. *Chicago, R. I. & P. R. Co.* 176 Fed. 1004, 1005; *Enos* v. *Kentucky Distilleries & Warehouse Co.* 111 C. C. A. 74, 189 Fed. 342; *Warax* v. *Cincinnati, N. O. & T. P. R. Co.* 72 Fed. 637, 640; *Welch* v. *Cincinnati, N. O. & T. P. R. Co.* 177 Fed. 760; *Chicago, B. & Q. R. Co.* v. *Willard,* 220 U. S. 413, 427, 55 L. ed. 521, 527, 31 Sup. Ct. Rep. 460; *Chicago, R. I. & P. R. Co.* v. *Schwyhart,* 227 U. S. 184, 193, 57 L. ed. 473, 477, 33 Sup. Ct. Rep. 250; *Adler* v. *Fenton,* 24 How. 407, 410, 16 L. ed. 696, 697; *Illinois C. R. Co.* v. *Sheegog,* 215 U. S. 308, 316, 54 L. ed. 208, 211, 30 Sup. Ct. Rep. 101; *Chicago, R. I. & P. R. Co.* v. *Dowell,* 229 U. S. 102, 113, 57 L. ed. 1090, 1095, 33 Sup. Ct. Rep. 684.

In the *Warax Case,* Judge Taft said: "If the right exists, the motive for its exercise cannot defeat it."

The court announced in the *Adler Case* that "an act legal in

itself, and violating no right, cannot be made actionable on account of the motive which superinduced it. It is the province of ethics to consider of actions in their relation to motives, but jurisprudence deals with actions in their relation to law, and for the most part independently of motive."

Mr. Justice Holmes, speaking ·for the court in the *Sheegog Case,* said: "In the case of a tort which gives rise to a joint and several liability, the plaintiff has an absolute right to elect, and to sue the tort-feasors jointly if he sees fit, no matter what his motive."

All the foregoing decisions deal with cases in which the element of conspiracy was lacking. . If the jury in the present case had been told by the court that they could not·find for the plaintiff unless the damages ·of which he complained were the result of a conspiracy between Hammond and others, the above authorities would not be in point, because in the case of a conspiracy the means ↓by which the wrong is accomplished, whether lawful or unlawful in themselves, are immaterial. *United States* v. *Rintelen,* 233 Fed. 793, 796; *United States* v. *Moore,* 173 Fed. 122, 132; *State* v. *Buchanan,* 5 Harr. & J. 317, 9 Am. Dec. 534; 12 C. J. sec. 3, p. 545. The gravamen of the action lies in the conspiracy and the resulting damage. *Hollinberger* v. *Stewart,* 41 App. D. C. 197, 199.

But the deliberations of the jury were not limited by the court to the conspiracy charged. After stating that a party has a right to rescind a contract "which threatens to turn out disastrously for him, * * * subject, however, to being mulcted in damages by the other party to the contract for whatever loss he may (might) suffer," the court said: "So that in reaching a conclusion in this case you are to consider all the elements which entered into the consideration of the defendant and his associates on the board of directors in passing the resolution which took away the rights of the plaintiff under these contracts, on the one hand; and if the motives that inspired that action, if the purposes which they had in view, were for their own protection or were bona fide to release them from an obligation which seemed to be a menace to the com-

pany, or to the individuals connected with the company, or in good faith was to terminate an agreement which apparently had no possibility or no probability of being carried out by the other party to it, or for any other reason involving good faith on their part, then Mr. Sully is not entitled to recover in this case. On the other hand, if the thing was done maliciously, if this resolution was passed maliciously, for the sake of injuring the property rights of the plaintiff, and not for these other motives which I have described, then he is entitled to a verdict at your hands, to be measured by a rule or an instruction which I will give you later."

Thus, the jury were told in effect that the resolution of November 23, by which the contracts referred to therein were rescinded, was legal, and if Hammond and his associates were liable to Sully on account of the passage of that resolution, it must be upon the assumption that their motive in passing it was vicious. By this instruction the question of conspiracy was put out of sight. Guided by it the jury could have found that there was no conspiracy and yet returned a verdict against Hammond on account of the motive which actuated him in doing what the court had said was in itself entirely legal. True, the jury were advised in another place that, if they found that plaintiff was injured through the conspiracy charged, they might find for him; but this detracts nothing from the fact that under the above instruction they could have found for him irrespective of the conspiracy. In no place were they admonished that they could not return a verdict for Sully unless they found a conspiracy.

We are satisfied that the court erred in giving the instruction quoted. The judgment is reversed, with costs, and the cause remanded for a new trial in harmony with the views expressed herein. *Reversed.*