VENTURE HOLDINGS LTD., Appellant,

v.

Oliver T. CARR, Jr., et al., Appellees.

No. 95–CV–267.

District of Columbia Court of Appeals.

Argued Feb. 22, 1996.
Decided April 11, 1996.

---

**4.** Rule 8(f) of the Fed.R.Civ.Pro. is identical to     Super.Ct.Civ.R. 8(f).

Julian Karpoff, Washington, DC, for appellant.

Arnold S. Albert, Washington, DC, for appellees.

Before TERRY, SCHWELB and RUIZ, Associate Judges.

SCHWELB, Associate Judge:

This dispute arises from a lease of retail space in a "food court" in Washington, D.C. The (appellant) tenant, which sold bakery items in the food court, claims that it was driven out of business when, first, the (appellee) landlord strictly and selectively enforced certain use restrictions in the lease, and second, the landlord leased an adjacent space to Au Bon Pain, a successful bakery operator. The landlord contends that, even if the tenant's allegations are true, the facts as alleged do not state a claim for relief. We agree and affirm.

## I.

### BACKGROUND

"For purposes of [a motion to dismiss for failure to state a claim upon which relief can be granted], the complaint must be construed in the light most favorable to the plaintiff and its allegations taken as true." *McBryde v. Amoco Oil Co.,* 404 A.2d 200, 202 (D.C. 1979). According to the complaint, in June 1991, Venture Holdings, Ltd. ("tenant") leased retail space in a food court inside a large office building in downtown Washington from Oliver T. Carr, Jr., Carr Realty Corporation, and Carr Real Estate Services, Inc. (collectively "landlord"). Paragraph 3 of the lease restricted the tenant's use of the premises to a bakery operation:

> Lessee will use and occupy the Demised Premises solely for the purpose of operating a high quality bakery for the sale, at retail, of bakery items including croissants, filled croissants, cakes.... Except as specifically provided herein, the Demised Premises may not be used for the sale of sandwiches (including bagel sandwiches) or for the sale of bagels with toppings....

Although the other food court tenants were similarly restricted to "specific and distinct menus," the complaint alleged that the landlord strictly enforced these restrictions only against the tenant:

> For example, since 1992 the Plaintiff was not allowed to sell bagels (except as purchased from the bagel shop at the food court) while other food court tenants were allowed to sell muffins and doughnuts.

In August 1994, the tenant contracted to sell its bakery operation, including the retail lease, to the "Zaza group," which intended to continue selling bakery items on the premis-

es. At a September 1994 meeting between the tenant, the Zaza group, and the landlord, the landlord announced that it had leased an adjacent space in the food court to Au Bon Pain, which is described in the complaint as "a highly aggressive and successful bakery operator." Although the landlord approved the proposed sale, the Zaza group withdrew from the arrangement.

In early October 1994, the tenant met with the landlord and "proposed to revitalize the Plaintiff's business, including the addition of bagels to the menu." The landlord refused to consent to the tenant's proposal and stated that Au Bon Pain would also be prohibited from selling bagels. The complaint alleges, however, that "[w]ithin a few weeks Au Bon Pain commenced operations at the site, including the sale of bagels."

The tenant then entered into a second contract to sell its bakery operation to Byung Hoo Lee, who "contemplated a non-bakery format of the business." The landlord refused to approve the sale, and stated in an October 1994 letter:

> You will not find us the least bit sympathetic to a use which is directly competitive with any of the existing tenants.

The second contract subsequently failed, and the tenant ceased operation of its retail bakery on December 31, 1994.

On January 10, 1995, the tenant filed a complaint in the Superior Court, in which it alleged that

> [t]he defendants, acting in bad faith and with a conscious disregard for the rights of the Plaintiff and in concert with each other and with the several other food court tenants including Au Bon Pain, by their selective and unfair enforcement of the restrictive covenants at the food court, coupled with their introduction of ruinous and direct competition to the Plaintiff in the form of Au Bon Pain, intended to destroy the Plaintiff's business and succeeded.

The complaint presents three separate theories under which the plaintiff is said to be entitled to relief: 1) the lease, as enforced, is an illegal contract under the D.C. Antitrust Act, D.C.Code §§ 28–4502, –4508 (1991), and common law; 2) the lease was terminated due to constructive eviction; and 3) the lease is null and void because the premises are not fit for the contemplated use because of a lack of ventilation capacity.[1]

In a detailed order dated February 24, 1995, the trial judge granted the defendant's motion to dismiss the complaint. The judge concluded, *inter alia*, that 1) there are no facts or inferences in the complaint to support a claim for constructive eviction; 2) the defendants lacked the capacity to enter into a civil conspiracy;[2] and 3) the complaint fails to allege the facts necessary to support a restraint of trade claim. The tenant appeals from these rulings.

## II.

## RESTRAINT OF TRADE

### A. Reasonableness of the Restrictions.

The tenant concedes in its brief that, on its face, the use restriction in the lease is valid:

> This lease provision, if fairly implemented, would probably be deemed a reasonable restraint of trade. The purpose of maintaining a balanced mix of vendors in the context of a food court or shopping center, if not abused by the actors, colorably justifies a reasonable restraint of trade.

The tenant contends, however, that the lease was not fairly implemented. First, according to the tenant, the landlord strictly enforced the use restriction against the tenant by limiting the tenant and its potential successors in interest to the sale of baked goods and by refusing to allow the tenant to sell bagels. Second, the landlord leased the adjacent space to Au Bon Pain and permitted Au Bon Pain to sell baked goods as well as bagels. According to the tenant, the landlord's conduct was designed to drive and in fact drove the tenant out of business, and the lease *as enforced* therefore constitutes an unreasonable restraint of trade.

In the first instance, we note that the tenant has not alleged that the lease contains

---

1. The tenant has not pressed this issue on appeal.

2. The trial judge apparently read the complaint as alleging a civil conspiracy.

an express provision which would prevent the landlord from leasing space near or adjacent to the tenant's premises to a direct competitor of the tenant.[3] As far as the record discloses, the lease in no way limits the landlord's discretion with regard to the leasing of other spaces in the food court. While the tenant clearly agreed to a restriction on its own use of the premises, it did not require the landlord to make a similar concession.

■ The question, then, is whether the landlord was entitled to enforce the use restriction in the lease against the tenant. The tenant argues that the restriction, as applied here, constitutes an unreasonable restraint of trade, and relies on *Ellis v. James V. Hurson Assocs.*, 565 A.2d 615 (D.C.1989). In *Ellis,* an employer brought an action against a former employee to enforce a post-employment covenant not to compete. *Id.* at 615–16. This court adopted the common law principles regarding promises in restraint of trade, as reported in the RESTATEMENT (SECOND) OF CONTRACTS,[4] and remanded for reconsideration of the covenant in light of those principles. *Id.* at 618–19.

The tenant's reliance on *Ellis* is misplaced. *Ellis* involved an express covenant by an employee not to "engage in business competition with the company" following termination of his employment. *Id.* at 616. Such a covenant not to compete implicates the common law policy against unreasonable restraints of trade because it is a promise to refrain altogether from competition with the promisee. *See* RESTATEMENT (SECOND) OF CONTRACTS, *supra* note 4, § 188 cmt. e (discussing "promise[s] to refrain from competition"). The use restriction in this case, by contrast, is not a promise to refrain altogether from competition. Rather, it is a promise to engage in competition in a certain way and with certain limitations. By signing the lease, the tenant essentially agreed to compete with other vendors in the food court by selling bakery items. Indeed, the lease provision contains an exhaustive list of the various bakery items that the tenant *may* sell in the food court, and it specifically prohibits only the sale of sandwiches and bagels. While the lease does restrict the tenant's use of the premises, the provision in this case is far less "detrimental to the smooth operation of a freely competitive private economy," *id.* at § 186 cmt. a, than the noncompetition covenant at issue in *Ellis.*

*Ellis* is the primary case cited by the tenant in support of its contention that the use restriction was unreasonable. We are aware of no precedent to support the tenant's position. Essentially, the tenant is asking us to place restrictions on the landlord's exercise of its rights under the lease, which was apparently freely negotiated,[5] when the lease itself contains no such restrictions. This a court may not do.

### B. Selective Enforcement.

■ The complaint also alleges that the landlord "selectively" enforced the use restriction against the tenant. The tenant apparently is claiming that the landlord refused to permit the tenant to sell bagels, while at the same time allowing Au Bon Pain to sell bagels and baked goods, perhaps in contravention of a similar use restriction in Au Bon Pain's lease.[6] Even assuming this claim to be true, however, the tenant is not entitled to relief based on a selective enforcement theory. The tenant has cited no authority—and we know of none—which would prevent the landlord from enforcing an otherwise valid

---

3. Counsel for the tenant conceded at oral argument that the lease contains no such provision.

4. According to the Restatement,
  (1) A promise to refrain from competition that imposes a restraint that is ancillary to an otherwise valid transaction or relationship is unreasonably in restraint of trade if
    (a) the restraint is greater than is needed to protect the promisee's legitimate interest, or
    (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.

RESTATEMENT (SECOND) OF CONTRACTS § 188(1) (1979).

5. There is no allegation in the complaint of fraud or duress in the negotiation of the lease.

6. The complaint nowhere explicitly alleges, although it does vaguely imply, that other tenants were permitted to sell anything which their leases actually proscribed.

use restriction, even if the landlord "acted more leniently *vis-a-vis* persons who have failed to comply with separate agreements with the enforcing party." *Bagley v. Foundation for the Preservation of Historic Georgetown,* 647 A.2d 1110, 1114 & n. 10 (D.C.1994).

## C. Evil Motive.

■ The tenant contends that its claims of anticompetitive conduct and selective enforcement should be considered in light of its allegation, repeated in various pejorative forms in the complaint, brief, and oral argument,[7] that the landlord enforced the restrictive covenant against the tenant in order to drive the tenant out of business. The tenant claims that this evil motive renders the restriction unreasonable and converts a facially valid provision into an unlawful restraint of trade. We do not agree with this contention.

The Supreme Court explicated the governing principle 135 years ago:

> An act legal in itself, and violating no right, cannot be made actionable on account of the motive which superinduced it. It is the province of ethics to consider of actions in their relation to motives, but jurisprudence deals with actions in their relation to law, and for the most part independently of the motive.

*Adler v. Fenton,* 65 U.S. (24 How.) 407, 410, 16 L.Ed. 696 (1861). More than half a century later, the Supreme Court of the District of Columbia elaborated on *Adler* in formulating the law of this jurisdiction:

In our view it would be a dangerous doctrine to announce that a party may be punished for doing that which is legal if in the judgment of a jury his motive was unworthy. Neither the diligence of counsel, nor our own researches, have uncovered any authority, either text or decision, which approves such a principle. Nor is it in consonance with reason. The motive of an act, as a general thing, has to do with its ethical value, not with its juristic character, and is immaterial where the act itself is legal. To condemn a legal act because of the motive which inspired it would be to subordinate the legal to the ethical, would be to condition the validity of acts upon the motive which called them into existence. This is not within the province of jurisprudence. Until ethical principles are adopted by the law they lie in a domain apart from the field in which jurisprudence operates. "As long as a man keeps himself within the law by doing no act which violates it, we must leave his motives to Him who searches hearts." *Chambers v. Baldwin,* 91 Ky. 121, 11 L.R.A. 545, 34 Am. St. Rep. 165, 15 S.W. 57. This is in harmony with many decisions of the Federal courts.

*Hammond v. Sully,* 48 App. D.C. 320, 329 (1919) (citations omitted).

Although of ancient vintage, the reasoning of the *Adler* and *Hammond* decisions remains persuasive in the modern era. *See, e.g., Bay City–Abrahams Bros. v. Estee Lauder, Inc.,* 375 F.Supp. 1206, 1211 (S.D.N.Y.1974);[8] *Hinrichs v. Tranquilaire Hosp.,* 352 So.2d 1130, 1131 (Ala.1977) (per

---

7. Old habits die hard in the art and craft of pleading. In *Bohn Mfg. Co. v. Hollis,* 54 Minn. 223, 55 N.W. 1119 (1893), a case not so very different from this one, the court stated that

> the affidavits and brief in behalf of the plaintiff indulge in a great deal of strong, and even exaggerated, assertion, and in many words and expressions of very indefinite and illusive meaning, such as "wreck," "coerce," "extort," "conspiracy," "monopoly," "drive out of business," and the like. This looks very formidable, but in law, as well as in mathematics, it simplifies things very much to reduce them to their lowest terms.

*Id.,* 55 N.W. at 1120. The court went on to hold that "[i]f an act be lawful—one that the party has a legal right to do—the fact that he may be actuated by an improper motive does not render

it unlawful." *Id.* at 1121. The court further stated that "[t]he mere fact that the proposed acts of the defendants would have resulted in plaintiff's loss of gains and profits does not, of itself, render those acts unlawful or actionable." *Id.*

8. Bad motive, by itself, ... is no tort. Malicious motives make a bad act worse, but they cannot make that a wrong which in its own essence is lawful. An act which does not amount to a legal injury cannot be actionable because it is done with a bad intent. 3 Cooley on Torts (4th Ed.), § 534, p. 545.

*Bay City–Abrahams Bros., supra,* 375 F.Supp. at 1211 (quoting *Krause v. Hartford Accident & Indem. Co.,* 331 Mich. 19, 49 N.W.2d 41, 44 (1951)) (alteration in original).

curiam); [9] *Gans v. Delaware Terminal Corp.*, 2 A.2d 154, 156 (Del.Ch.1938); [10] 74 AM. JUR.2D *Torts* § 6, at 623–24 (1974 & 1995 Supp.).

There are, of course, exceptions to the foregoing principles. The intentional infliction of emotional distress, for example, is actionable in circumstances where recovery would be denied if the same distress had been caused by the defendant's mere negligence—the actor's state of mind is decisive. *See, e.g., Drejza v. Vaccaro,* 650 A.2d 1308, 1312 (D.C.1994). The tenant has cited no authority, however, and we are aware of none, in which a defendant's exercise of a right secured by a contractual arrangement with the plaintiff has been held to be unlawful on account of the defendant's alleged evil motive.

The lease permitted the landlord to prohibit the tenant from selling bagels. Nothing in the lease precluded the landlord from renting space to Au Bon Pain. Such a preclusive provision could perhaps have been negotiated, but it was not. We conclude that no unlawful conduct has been alleged and that the tenant's unfavorable characterizations of the landlord's motive do not alter that dispositive fact.

*D. Constructive Eviction.*

■ Alternatively, the tenant claims that the landlord's conduct—enforcing the use restriction against the tenant and leasing the adjacent space in the food court to Au Bon Pain—amounted to a constructive eviction. The tenant argues that the landlord

> destroyed [the] tenant's business by wrongful acts which precluded the tenant from engaging in the only use for the premises permitted under the lease ... even though there was no allegation [in the

complaint] that the landlord physically denied the tenant access to the subject premises, or that the tenant abandoned the premises.

■ We agree with the tenant that, in order to proceed with a claim of constructive eviction, it need not allege actual physical removal from the premises. As this court stated in *Bown v. Hamilton,* 601 A.2d 1074 (D.C.1992),

> [b]oth historically and functionally, the doctrine of constructive eviction is an extension of the doctrine of actual eviction. Here the concept is that, because of some wrongful act or omission by the landlord, the premises become uninhabitable ("untenantable") for the intended purposes. The tenant is not physically evicted or excluded—but he might as well be.... Thus, there is an eviction, though constructive instead of actual.

*Id.* at 1077 n. 9 (quoting ROGER A. CUNNINGHAM, ET AL., THE LAW OF PROPERTY § 6.33, at 296 (1984) (alteration in original)).

■ Although physical interference is not a necessary element of a constructive eviction claim, however, it is essential that the tenant's quiet enjoyment be disturbed by "some *wrongful* act or omission by the landlord." *Id.* (emphasis added). In this case, the tenant agreed to the use restriction in the lease, and the landlord made no corresponding promise not to rent adjacent spaces to direct competitors of the tenant. The landlord was therefore entitled to lease the adjacent space to Au Bon Pain and to enforce the use restriction against the tenant. Because the tenant has alleged no legally wrongful conduct on the landlord's part, the

---

9. If one does an act which is legal in itself and violates no right of another, the fact that this rightful act is done from bad motives or with bad intent toward the person so injured thereby does not give the latter a right of action against the former.
   *Hinrichs, supra,* 352 So.2d at 1131 (quoting *Tennessee Coal, Iron & R. Co. v. Kelly,* 163 Ala. 348, 50 So. 1008, 1010 (1909)).

10. The cases are rather numerous which hold that if an act be lawful, no one can claim to be damaged by it because either bad faith or even malicious purpose and intent inspired it. The motive with which a lawful act is done, is immaterial. *Nullus videtur dolo facere qui suo jure utitur.*
   *Gans, supra,* 2 A.2d at 156. For the reader who prefers maxims to be in English, the italicized language means: "No one is considered to act with guile who uses his own right." Black's Law Dictionary 1068 (6th ed. 1990).

complaint fails to state a claim for constructive eviction.[11]

## III.

## CONCLUSION

Accordingly, the order appealed from hereby is

*Affirmed.*

RUIZ, Associate Judge, concurring:

I concur in the judgment that the complaint was properly dismissed because it does not state a claim for constructive eviction or restraint of trade. I write separately because my reason for concluding that dismissal of the restraint of trade claim was appropriate is different from that stated in the majority opinion. I believe that certain parts of the complaint, if read in isolation, could be said to state a claim for restraint of trade based on a landlord's selective enforcement of an otherwise lawful contractual provision in a lease because it was done at the instance of horizontal competitors for the purpose of driving the appellant out of business. Although I agree with the majority that "evil motive" does not convert a lawful act into an actionable claim, that is not the point we must address in deciding whether the complaint states a claim. The issue of law is whether the alleged effort to drive a competitor out of business by selective enforcement of a clause at the instance of horizontal competitors is made unlawful by the D.C. Antitrust Act, D.C.Code §§ 28–4502, –4508 (1991 & 1995 Supp.). If it is, the fact that the contractual provision enforced by the landlord is, if viewed by itself, lawful, does not constitute a "safe harbor" in which one bent on violating the Antitrust Law can maneuver at will. As the majority notes, *ante* at 692 n. 11, an otherwise lawful act may be done in an unlawful manner or for an unlawful purpose.

Unfortunately, appellant has not provided much to help us answer the legal question whether the efforts of the landlord and the other tenants, when viewed in the light of the alleged anticompetitive motivation behind the selective enforcement of the contractual provision, are unlawful under the Antitrust Act. There is some Maryland authority that suggests they might be. *See Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 485 A.2d 663 (1984). It appears that this court has not previously ruled on the issue; the lack of advocacy on the point leads me to conclude that this is not the case in which to do so.

I also concur in the result because, reading the complaint as a whole, I am left with the impression that, although couched in terms of a claim for restraint of trade, the appellant's real complaint seems to be that the landlord did not abide by the understanding that the mutually exclusive contractual use provisions in the various food court leases would be strictly enforced so as to minimize competition among the food court vendors. That understanding, if pled and proven, could well sound in contract and survive a restraint of trade challenge in the context of a food court. As the trial court observed, however, it is anomalous at best to use the Antitrust Act to further such an arrangement.

---

11. In light of our holding that the landlord had the right to enforce the use restriction in the lease, there was neither "an unlawful act, [n]or a lawful act [done] in an unlawful manner." *See International Underwriters, Inc. v. Boyle,* 365 A.2d 779, 784 (D.C.1976). Therefore, we do not reach the question whether, as the trial judge concluded, the defendants lacked the capacity to enter into a conspiracy.