The GRAND UNION COMPANY, a Delaware corporation, Plaintiff,

v.

LAUREL PLAZA, INCORPORATED,
a Maryland corporation,

Laurel/Bowie Development Corporation,
Incorporated

and

the Great Atlantic and Pacific Tea Company, Inc., a Maryland corporation,
Defendants.

Civ. No. 16772.

United States District Court
D. Maryland.

Feb. 8, 1966.

Burton A. Schwalb and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for plaintiff.

Shale D. Stiller, Lawrence F. Rodowsky and Frank, Bernstein, Conaway, Gump & Kaufman, Baltimore, Md., for Laurel Plaza, Inc., and Laurel/Bowie Development Corp.

William B. Kempton and L. Vernon Miller, Jr., Baltimore, Md., for Great Atlantic & Pacific Tea Co.

WINTER, District Judge:

The Grand Union Company (Grand Union) sues Laurel Plaza, Incorporated (Laurel Plaza), Laurel/Bowie Development Corporation, Incorporated (Laurel/Bowie), and The Great Atlantic and Pacific Tea Company, Inc. (A. & P.) for a declaratory judgment that defendants, presently engaged in construction, propose to operate a food supermarket in violation of an exclusive covenant in favor of Grand Union contained in a lease by and between Grand Union and Laurel Plaza. Defendants deny that Grand Union is the beneficiary of a covenant which would prohibit defendants from completing construction of the supermarket and A. & P. from operating it; but if Grand Union is the beneficiary of such a covenant, defendants contend that Grand Union is guilty of laches in exercising its rights and pursuing its remedies, so that defendants should not be enjoined as prayed.

The controversy arises out of the activities of a certain Stanley S. Levy (Levy) who, prior to April 19, 1961 and thereafter, acquired lands at the intersection of Fort Meade Road (Route 198) and Route 197 in Laurel, Maryland. As the sole stockholder of Laurel Plaza and Laurel/Bowie, as well as a third corporation, Urban Developers, Incorporated, Levy conveyed certain lands to Laurel Plaza on April 19, 1961 and thereafter by additional conveyances to the corporations which he controlled and intercorporate conveyances vested title in Laurel Plaza to certain lands bordered on the south by Fort Meade Road, on the west by proposed Main Street (which has not been built), and on the east by the Patuxent River, in the area of the Laurel Racetrack. Most of this described area constitutes what is now known as "Laurel Plaza Shopping Center," in which Grand Union has leased a supermarket. Laurel Plaza also owns a portion of a four-acre tract south of Laurel Plaza Shopping Center and opposite to it on the south side of Fort Meade Road. The remainder of the tract on the south side of Fort Meade Road is owned by Laurel/Bowie, and the four acres are now known as "Steward Village Shopping Center." It is in the Steward Village Shopping Center that Levy, Laurel Plaza and Laurel/Bowie are constructing and have leased to A. & P. the supermarket about which Grand Union complains.

Early in 1961, Laurel Plaza began development of its shopping center. It entered into a development contract with Frederick W. Berens Co. (Berens), a real estate developing firm, which issued a number of brochures showing a proposed shopping center on the north side of Route 198, having thereon two supermarkets. Berens tried to interest Grand Union and A. & P. in operating these supermarkets. Each was interested, but each declined to enter into a lease except on an exclusive basis, i. e. that it would be the only supermarket. Projections of Grand Union as to anticipated gross income and expenses demonstrated to it that, except on an exclusive basis, the operation would not be economically feasible.

After unsuccessful attempts to persuade Grand Union and A. & P. that they would be helped, not hurt, by competition, Levy, through Berens, advised Grand Union and A. & P., by letter dated May 26, 1961, that the developers had concluded to abandon the idea of two major food chains in the development and would offer a lease with an exclusive covenant to Grand Union and other food chains which had expressed interest in the location. Negotiations ensued among Grand Union, Berens, Levy and Laurel Plaza, and a letter of intent to lease supermarket facilities was prepared. The letter was not acceptable to Grand Union but, since the parties were so close to agreement, they proceeded to the preparation of a lease, rather than a revision of the letter of intent.

The initial lease, prepared by office counsel of Grand Union, gave Grand Union the exclusive right to operate a supermarket in the shopping center and in an area 5,000 feet therefrom on lands owned or controlled by the lessor. This proposed lease was negotiated to reduce the geographical scope of the restrictive covenant to 2,500 feet, but when Grand Union incorporated the changes agreed upon into a rewrite of the draft of lease, the 5,000 foot limitation erroneously was retained.

On November 14, 1961, the rewritten lease was taken to Washington, D. C., by J. V. McEvily, staff counsel for Grand Union, who had prepared it. The lease had been executed by Grand Union, a fact which all witnesses treat as unusual and which McEvily explained on the ground that Grand Union was trying to persuade Levy, on behalf of Laurel Plaza, to execute a lease with Grand Union, rather than to execute a lease with A. & P. which would have insisted that the landlord execute the lease first and would have insisted upon an unqualified right of cancellation for a period of ninety days. McEvily took the lease to the Berens' office and some discussion concerning it ensued. The testimony is in conflict as to what was discussed and what, if anything, agreed upon. Levy and his corporations were represented by David Hornstein, Esq., who could not be present at the meeting in the Berens' office, but who conducted another meeting at his apartment that night.

At Hornstein's apartment on the night of November 14, 1961, McEvily's proposed lease was examined. The evidence as to exactly what was discussed and what was agreed to is, again, in conflict, but it is undisputed that Hornstein suggested the use of the word "contiguous" as applied to properties other than the shopping center in defining the area in which Grand Union would have the exclusive right to operate a supermarket. It was agreed that the next day McEvily would prepare a letter modifying the lease, and that he would deliver a signed copy of the letter in exchange for Levy's delivering an executed copy of the lease.

On the morning of November 15, 1961, McEvily went to the Berens' office and dictated and signed a letter committing Grand Union to make certain changes in the lease, which provided, *inter alia:*

"1. We will modify Paragraph 11 to provide that Grand Union shall be the exclusive Supermarket in the Shopping Center (including contiguous lands as per drawing attached)."

The drawing attached to this letter was an architect's drawing, dated November

1, 1961, having the title "Proposed Site Plan of Laurel Properties for Urban Developers, Inc." The drawing did not designate the portions of the area depicted thereon as to which title was vested in any particular corporation controlled by Levy, and the drawing clearly and unmistakably showed the proposed construction of a supermarket in Laurel Plaza Shopping Center and the proposed construction of a supermarket in Steward Village Shopping Center, as well as proposed construction northwest of proposed Main Street in the tract which was thereafter conveyed to Urban Developers, Inc. The letter was exchanged for a copy of the lease executed by Levy in the name of Laurel Plaza, as per agreement.

The action of the parties was formalized by a Modification of Lease by and between Laurel Plaza and Grand Union, dated November 21, 1961. This modification deleted Paragraph 11 of the original lease,[1] and substituted in lieu thereof the following:

"During the term of this lease and any extension thereof the Landlord shall not use nor permit to be used any other part of the shopping center or any other property directly or indirectly owned or controlled by the Landlord contiguous to lands affected by this lease for the sale of food for consumption off premises. The Tenant shall be entitled to injunctive or other appropriate relief upon a breach of this covenant."

It is conceded by the parties that had the 5,000 foot limitation, or the 2,500 foot limitation, been retained in the executed lease, Laurel Plaza would be prohibited from entering into a lease with A. & P. in the Steward Village Shopping Center, and A. & P.'s operation of such a facility would be in violation thereof. Whether the same result follows from the language substituted therefor depends upon whether "contiguous" is deemed to apply to land south of and across Fort Meade Road, or whether its meaning is to be restricted to some other area. A subsidiary question is whether, if "contiguous" is deemed to apply to land south of and across Fort Meade Road, Grand Union is entitled to equitable relief.

## LEGAL PRINCIPLES

As defined by Webster's New International Dictionary (3rd Edition), "contiguous" means "touching along boundaries often for considerable distances" or "next or adjoining with nothing similar intervening" or "nearby, close: not distant." Thus, "contiguous" may embody the concept of touching, or it may embody the concept of near, but not touching. By one definition, Grand Union's contention should prevail; by the other, defendants' contentions should prevail. What the parties meant in this case cannot be determined solely from the language they employed; what they meant depends upon the sense in which they used the word "contiguous"—a question of intent.

The Maryland cases make clear that under Maryland law, which applies here, restrictive covenants are enforceable, but they are to be construed strictly, although in accordance with the intent of the parties. Freedman v. Seidler, 233 Md. 39, 194 A.2d 778 (1963); Maryland Trust Co. v. Tulip Realty Co., 220 Md. 399, 153 A.2d 275 (1959); Glen Burnie Shopping Plaza, Inc. v. Schreiber Bros., Inc., 220 Md. 303, 152 A.2d 807 (1959); Slice v. Carozza Prop., Inc., 215 Md. 357, 137 A.2d 687 (1958). The parties con-

---

1. Original Paragraph 11 read:
"During the term of this lease and any extension thereof the Landlord shall not use nor permit to be used any other part of the shopping center or any other property directly or indirectly owned or controlled by the Landlord within a radius of five thousand feet of the shopping center for the sale of food for consumption off premises. The Tenant shall be entitled to injunctive or other appropriate relief upon a breach of this covenant."
"Shopping Center" was defined pictorially by attachment of a plat to a lease. This plat showed no commercial development except in the triangular area bounded on the south by Fort Meade Road, on the east by the Patuxent River, and on the northwest by proposed Main Street.

cede that the basic rule of contract law, which permits resort to extrinsic aids in a determination of what the parties intended when the language they employed is ambiguous, is fully applicable, notwithstanding that the parties' intent, once ascertained, is to be narrowly applied because of public policy favoring unrestricted use of property. A case which exemplifies how the Maryland courts will weigh the various interests and rules of law mentioned to determine the scope of an ambiguous restrictive covenant is Slice v. Carozza Prop., Inc., supra. There the Court held that a restrictive covenant granting a lessee the exclusive privilege of merchandising alcoholic beverages for off-premises consumption "in the Hillcrest Heights Shopping Center" extended to a second section of the center not contemplated by the parties when the lease was signed and erected three to four years later. The Court reasoned that as "a plain economic fact" the second section was "an integral part of a single shopping center," and that the parties constructively intended the covenant to extend to such additions by the lessor. The parties concede that this case is the closest in its facts to the instant case, although that case did not concern an addition separated by a public street. Consistent with this case, resolution of the first issue depends upon a construction and analysis of the evidence indicating the intent of the parties.

## DISCUSSION OF EVIDENCE

As stated before, the evidence of what was discussed and what, if anything, agreed upon at the meeting in the Berens' office during the morning of November 14, 1961, is in conflict, and what was discussed and what, if anything, agreed on at the meeting at the Hornstein apartment on the evening of November 14, 1961, is in conflict. J. V. McEvily, staff counsel for Grand Union, who prepared the lease, brought it to Washington and was present at both meetings, testified for the plaintiff. He related that at the morning meeting the form of the lease which had been previously executed by Grand Union was gone over, but there was no particular discussion about the restrictive covenant except for the fact that he had prepared the lease with a restriction conditioned upon 5,000 feet, rather than 2,500 feet, as previously agreed. According to his testimony, it was not until the evening meeting that any changes of substance in the lease were considered. At that meeting three changes in the lease, including the change in the restrictive covenant, were discussed and, at the suggestion of Mr. Hornstein, the parties agreed to alter the restrictive covenant to employ the word "contiguous." This was done to narrow the scope of the restriction, but it was nevertheless intended to retain application of the restriction to land on the south side of Fort Meade Road and to lands on the northwest side of proposed new Main Street.

In opposition to the testimony of Mr. McEvily, defendants presented the testimony of David A. Holmes, an employee of Berens, at whose office the morning meeting was held, David Hornstein, Esq., counsel for Levy and the corporations which Levy controlled and at whose apartment the evening meeting was held, and Levy. Holmes confirmed that the meeting was held the morning of November 14, 1961, at his office. In substance, his testimony provides little basis for defendants' contention of what was intended by the rewording of the restrictive covenant except to contradict Hornstein and Levy. Holmes testified that at the morning meeting he called attention to the fact that the draft stated a restriction in terms of 5,000 feet instead of 2,500. McEvily acknowledged that this was a mistake, and Holmes insisted that the restrictive covenant be removed in its entirety. Holmes maintained that he had always told Grand Union that A. & P. would establish a supermarket in the area, including the possibility that A. & P. would establish a supermarket on the four-acre tract south of Fort Meade Road. Holmes' testimony continued to the effect that after Holmes' demand for

elimination of the restrictive covenant, McEvily telephoned his principals in New Jersey and reported that he was authorized to negotiate, but that, thereafter, all parties agreed that solution of the problem of the restrictive covenant would be deferred until the evening meeting. Holmes did not attend the evening meeting.

Levy was present at both meetings. He testified that at the morning meeting he demanded that Grand Union agree to a total elimination of the restrictive covenant, or else he would not agree to lease a store in the Laurel Plaza Shopping Center. McEvily, or one of the other representatives of Grand Union present at the meeting, then called the Grand Union home office in New Jersey and obtained clearance on Levy's demand. Thereafter, it was absolutely agreed that Grand Union would have an exclusive right to sell food for off-premises consumption only in the Laurel Plaza Shopping Center, and Levy would be free to build additional supermarkets on the four-acre tract south of Fort Meade Road, as well as on the north side of the Laurel Plaza Shopping Center, or both. Indeed, Levy remembers "clear as a bell" that he proposed to build a supermarket on the south side of Fort Meade Road, and Grand Union's representative got permission by telephone to agree to this proposal, and did so agree. At the meeting that night Levy told Hornstein of Grand Union's agreement to modify the restrictive covenant to free Levy in the manner stated. No one present at the meeting, including the representatives of Grand Union, disputed the assertion of the existence of a prior agreement as described by him; and the language employed in McEvily's letter of the next day and in the formal modification of November 21, 1961, was agreed upon.

Mr. Hornstein's version was that at that meeting Levy stated the agreement reached earlier in the day, and no objection was voiced to Levy's having a supermarket on the south side of Route 198.

Hornstein then suggested that the appropriate word to carry into effect this agreement would be the word "contiguous," and McEvily, as counsel for Grand Union and as its representative authorized to negotiate, agreed to the suggested term. Hornstein has no recollection of any discussion of an application of the restrictive covenant to the area west of proposed new Main Street. When he suggested the use of the word "contiguous," Hornstein knew that Levy contemplated a supermarket on the four-acre tract south of Route 198. He thought, and so stated, that "contiguous" meant "touching." In other words, "contiguous" properties would be properties touching one another, and not properties separated by a public street or any other area.

After McEvily signed the letter of November 15, 1961, he undertook to draft the formal Modification of Lease executed November 21, 1961, and, in accordance with procedures usually followed by Grand Union, he prepared a memorandum to the officer executing on behalf of Grand Union in regard to the purpose of the modification. Insofar as the restrictive covenant was concerned, McEvily's memorandum was perfectly consistent with his testimony of his intention and understanding as to the use of the word "contiguous." It is significant, also, that for a period of twenty-nine months after the letter of November 15 and the modification of November 21, all plats of the area prepared at the instance of Levy, Laurel/Bowie and Laurel Plaza eliminated any indication that a supermarket was proposed to be built on the south side of Fort Meade Road.

Resolution of the main issue of intent of the parties involves in large part a question of credibility of witnesses. As stated earlier, Holmes, if a credible witness, gives little support to the interpretation of the word "contiguous" advocated by defendants because he claimed no agreement had been reached at the meet-

ing at which he was present.[2] Neither Levy nor Hornstein is a witness entitled to much credence. Levy's testimony was shown to depart in substantial respect from a pretrial deposition and the inconsistencies related to important matters. Notwithstanding Levy's claim that there was a clear understanding of what all parties intended by the use of the word "contiguous," Levy found its meaning sufficiently ambiguous that after the events in question he requested an opinion from Hornstein as to what it meant.

Hornstein repeatedly during his testimony demonstrated that he could remember nothing except that of which he had made a memorandum, and he admitted that he had never made a memorandum of any discussion concerning the word "contiguous." His only recollection of the evening of November 15 related to the restrictive covenant, while at least two other matters, one of which also involved a restriction on the use of the land, should the shopping center not be developed, were considered, discussed and made a part of the Modification of the Lease.

Notwithstanding his claim that "contiguous" had the fixed meaning of "touching" to him, it was shown that, on October 26, 1961, five days after Hornstein prepared a memorandum concerning the proposed Grand Union lease and before he suggested the substitution of the word "contiguous," he also prepared a memorandm concerning a lease proposed by A. & P. and recommended a change in the restrictive covenant contained therein. The change recommended also employed the word "contiguous," but Hornstein found it necessary to add an additional phrase to spell out that "contiguous" should exclude land separated by a public street. His explanation as to why "contiguous" without this qualification included lands separated by a public street, in the A. & P. lease and not in the letter of November 15 and the Modification of Lease of November 21, was unconvincing.

■ McEvily is the more convincing witness, and his testimony, viewed in the light of the documentary proof and evidence of the prior negotiations between the parties,[3] and weighed against conflicting evidence, persuades the Court by a preponderance of the evidence that the parties intended the word "contiguous" to include the property south of Fort Meade Road, so that Grand Union's exclusive right to sell food for consumption off the premises embraced that area, as well as within the physical limitation of Laurel Plaza Shopping Center, and properties physically touching the center.

McEvily's testimony is attacked because, it is argued that, if believed, the word "contiguous" would be synonymous

2. Holmes is the witness whose testimony was described as "confused and confusing" in Slice v. Carozza Prop., Inc., supra. His credibility in that case, of course, has nothing to do with his credibility in the instant case. He had left the employ of Berens, April 30, 1962, and had not had any occasion to remember any of the events of November 14 and 15 until approximately three weeks before the trial, at which time he had no recollection of any of the essential aspects of his testimony. He claimed that his recollection was refreshed by sitting in court and having heard plaintiff's witnesses, Levy and Hornstein, testify before he was called as a witness.

3. Grand Union, from its income and expense projections, knew that it was not interested in a lease which permitted a competing supermarket. The immediate area surrounding the shopping center was already sufficiently saturated with supermarkets that competition would be too severe if there were another competitor. Levy, and through him Laurel Plaza and Laurel/Bowie, knew that neither Grand Union nor A. & P. was interested in a non-exclusive lease. Levy decided to accede to the tenants' demands. Under such circumstances, the comment in Slice v. Carozza Prop., Inc., supra, seems pertinent:

"* * * the parties to the appellants' lease were experienced business people. It would seem strange to suppose that they did not deal with each other and use business language in such a way as to accomplish an obvious and common sense business result."

with the 2,500 foot restrictive covenant previously agreed to, and would render the substitution nugatory. The evidence shows, however, that there was substantial commercial development, including several other supermarkets, within an area of 2,500 feet from Laurel Plaza and also that a large residential development, i. e., Maryland City, was planned nearby and, in the contemplation of the parties, would probably be the site for another supermarket. Thus, McEvily's understanding that the first agreed upon 2,500 foot restriction was watered down by the substitution of the word "contiguous" was correct, because the effect of the substitution would be to permit Levy, through the corporations he controlled, greater freedom in developing a supermarket within the area under a test of "contiguous" than under the test of "2,500 feet."

The subsequent conduct of the parties also supports the McEvily version of what was agreed upon. Mention has been made of the fact that Levy, Laurel Plaza, Laurel/Bowie and Urban Developers, Incorporated eliminated any reference to a supermarket in any of the plats prepared under their direction for the period November 14, 1961, until August, of 1964. A supermarket on the south side of Fort Meade Road was shown on a plat just before defendants, in November, 1964, proposed to Grand Union that the latter agree to pay an increased rental on a store not yet built in consideration for defendants cancelling a lease to A. & P.—a lease which the Court views to have been nonexistent at the time, since A. & P. did not sign the lease until April 15, 1965.

Defendants make three arguments not heretofore commented on as to why the word "contiguous" should exclude the property south of Fort Meade Road. They argue, first, that the word "contiguous" as used in the restrictive covenant, ¶ 11 of the lease, is in effect defined by its use in ¶ 33 of the lease. The relevant portion of ¶ 33 is set forth in the margin.[4] Defendants refer to the drawing annexed to the lease and argue from it and the language of ¶ 33 that the parties used the words "contiguous" and "contiguity" in the sense of "touching," because ¶ 33 contains the provision "except as indicated on the annexed drawing," and the annexed drawing shows all "Other Stores" not to touch one another. The same argument is made with respect to "Future Stores," because ¶ 33 says that future stores shall be contiguous with one another "except as indicated on the annexed drawing," and the annexed drawing shows none of the buildings designated "Future Stores" touching one another. Defendants' argument is unconvincing because the words "contiguous" and "contiguity" have no clear meaning when the language of ¶ 33 is read in the light of the plat attached to the lease. "Contiguous," as applied to "Other Stores," is unclear because the plat shows "Other Stores" both separated and touching one another but not touching Grand Union's store. It is impossible to say which are "contiguous" and which are "except as indicated on the annexed drawing." In regard to "Future Stores," required to be "contiguous with one another and with the remainder of the shopping center," the plat shows (a) no "Future Store" touching another "Future Store," (b) one "Future Store"

---

4. "33. Prior to delivery of the demised premises to the Tenant the Landlord shall erect 100,000 square feet of other stores upon the areas designated 'Other Stores' on the annexed drawing.

"All such 'Other Stores' shall be contiguous with the Tenant's store and with one another except as indicated on the annexed drawing * * *; construction shall be carried out so as to maintain the required contiguity of stores at all times. The Landlord may at any time during the term of this Lease * * * construct 45,000 square feet of additional stores upon the area designated 'Future Stores' on the annexed drawing. Such stores shall be contiguous with one another and with the remainder of the shopping center except as indicated on the annexed drawing * * *. Construction of such future stores shall be carried out so as. to maintain the contiguity thereof at all times. * * *"

touching no other store, (c) one "Future Store" touching one "Other Stores," and (d) one "Future Store" touching Grand Union's store. Again it is impossible to determine which of these examples is "contiguous" and which is "except as indicated on the annexed drawing," as applied to "Future Stores." It is manifestly impossible to construe "contiguous" to have a fixed meaning applicable to both "Other Stores" and "Future Stores."

Defendants' second and third arguments are based upon two later modifications of the lease made under dates of May 20, 1964, and November 12, 1964, respectively. The May 20, 1964 modification consisted of two documents—one entitled "Modification Agreement" dated May 20, 1964, and other "Agreement of Restriction" dated May 21, 1964. These documents came into existence because the parties contemplated at the time the original lease was executed that the area of Laurel Plaza Shopping Center would be twenty-two acres. Levy's plans for development of this area were fluid after the lease was executed. At one time he contemplated expanding the area to fifty acres, but abandoned this objective either because he could not obtain leases or financing for a regional shopping center. As time passed and the deadline by which he was obligated to provide a store for Grand Union approached, he concluded to shrink the area of the shopping center to eight acres. The Modification Agreement of May 20, 1964, was designed primarily to alter the area requirements specified in the original lease, and the Agreement of Restriction of May 21, 1964, was designed to alleviate the restrictive covenant on the sale of food for consumption off the premises *in the area north of Fort Meade Road* by providing that the restriction would not apply to any area of 3,000 square feet or less constituting part of a major department store. Neither document attempted further to modify or define the restriction on "contiguous" properties, and the defendants argue that silence in this regard is to be treated as

evidence that the parties did not intend the restriction to apply south of Fort Meade Road because Levy had indicated in 1962 to Leon Longchamp, Grand Union's field real estate supervisor in the Washington area, that Levy desired to place a second supermarket in the shopping center.

The answer to this argument is that Levy indicated he wished to place an A. & P. supermarket in the shopping center north of Fort Meade Road, and when this permission was refused by Longchamp and others, Levy did not pursue the matter prior to the documents of May 20, 1964, and May 21, 1964. Other evidence shows that after the original lease was signed, no plat brought to the attention of plaintiff before the execution of these two documents gave any indication that Levy wished to place a supermarket on the south side of Fort Meade Road. Plaintiff was fully justified in not taking a more aggressive position in bringing about a clearer definition of the application of the restrictive covenant to the south side of Fort Meade Road; its failure so to do does not overcome the meaning to be placed on ¶ 11 of the original lease, as previously stated.

Defendants' third argument relates to a modification of the lease made November 12, 1964. This document, entitled "Third Modification Agreement," was again to update the Grand Union lease in the light of events which had transpired since the previous modification. It acknowledged that a certain lease with Sears Roebuck was no longer in effect and references thereto were stricken from the original lease. The times for the doing of certain acts were extended. The specifications of the building to be constructed for Grand Union were altered and a new plot plan was made a part of the original lease. Again, the document made no mention of the application of a restrictive covenant to the south side of Fort Meade Road and, again, defendants argue that silence on the part of the parties, and the absence of any effort on the part of Grand Union to clarify the application of the restrictive covenant is

indicative of the fact that the restrictive covenant was considered inapplicable to the south side of Fort Meade Road.

■ Again the answer is plaintiff's silence could as well be interpreted to mean that Levy, Laurel Plaza and Laurel/Bowie lulled plaintiff into a belief that Levy acquiesced in Grand Union's asserted interpretation of the application of the restrictive covenant. The evidence shows that in August, 1964, Levy's then rental agent proposed to Grand Union that Levy would build another supermarket on the south side of Fort Meade Road and in fact had a lease with A. & P. for that purpose. Grand Union denied Levy's right so to do. Then, by letter dated November 2, 1964, Laurel Plaza proposed to Grand Union that the latter pay an increased rental in consideration of defendants' cancelling a nonexistent lease to A. & P. on part of the area south of Fort Meade Road and exhibited a plat showing the location of the proposed A. & P. store. The proposal was rejected by Grand Union, in writing, without Grand Union's making mention of the restrictive covenant in its letter of rejection. However, after the conversations in August, Henry G. Doyle, Jr., the then real estate consultant for Levy who made the initial proposal, wrote Longchamp, of Grand Union, suggesting a draft of what ultimately became the Third Modification Agreement, sending him a new plat dated October 24, 1964, and stating, *inter alia*, "You will note that there is no reference to the other food market on the south side of Route 198. Mr. Levy is meeting with his lawyer this afternoon to make an analysis of this situation and will contact you direct on the matter." The new plat enclosed in the letter eliminated any reference to an A. & P. supermarket south of Fort Meade Road. Again, the Court concludes that Grand Union was justified in not taking a more aggressive stand or exerting additional effort to spell out more specifically application of the restrictive covenant to the area in question. Its failure so to do under these circumstances does not show that the word "contiguous" had a meaning different from that previously found.

■ As ultimate findings of fact and conclusions of law, the Court concludes that ¶ 11 of the Grand Union lease grants to Grand Union the exclusive right to operate a supermarket for the sale of food for consumption off premises, that this exclusive right extends to Steward Village Shopping Center, the four-acre tract south of Fort Meade Road owned in part by Laurel Plaza, and that the acts of Levy, Laurel Plaza, Laurel/Bowie and A. & P. in entering into a lease which purports to permit A. & P. to operate a supermarket for the sale of food for consumption off premises is in violation thereof. There remains for decision only the question of the relief to which Grand Union is entitled.

## RELIEF AND DEFENSE THERETO

■■ Maryland law, applicable here because of diversity of citizenship, recognizes the lessee's right to enforce restrictive covenants by injunction. Glen Burnie Shopping Plaza, Inc. v. Schreiber Bros., Inc., supra; Slice v. Carozza Prop., Inc., supra; Snavely v. Berman, 143 Md. 75, 121 A. 842 (1923); Belvedere Hotel Co. v. Williams, 137 Md. 665, 113 A. 335, 14 A.L.R. 622 (1921). Since it is admitted that the Grand Union lease and all modifications were recorded, and that Laurel Plaza was an owner of a portion of Steward Village Shopping Center at the time the Grand Union lease was executed, and also at the time the A. & P. lease was executed, A. & P., under Maryland law, could be subjected to the equitable relief necessary to enforce the restrictive covenant, Slice v. Carozza Prop., Inc., supra; Belvedere Hotel Co. v. Williams, supra.

Defendants collectively, however, contend that Grand Union is barred by laches because it has delayed instituting its suit and the delay has prejudiced defendants. It is argued that Grand Union well knew that Laurel Plaza proposed to build a supermarket to be leased to A. & P. and unduly delayed in asserting its rights.

The evidence does not provide any basis on which defendants may invoke the equitable doctrine of laches. So far as the legal position of the parties was concerned, the Court finds that after the Grand Union lease was executed neither Levy nor any defendant communicated any claim of right to build the A. & P. supermarket on the south side of Fort Meade Road until August, 1964. At that time Henry G. Doyle, Jr., the then representative for the Levy interests, communicated a claim of such right orally to Leon Longchamp, Grand Union's local representative. This claim of right was controverted at least three times by Longchamp. That Grand Union's position was effectively understood is acknowledged by Doyle's letter of October 26, 1964, in which he was careful to point out that the plat forwarded therein eliminated any reference to the A. & P. supermarket on the south side of Route 198, and that Levy was meeting with his lawyer to make an analysis of the situation. When Laurel Plaza made a formal proposal to cancel a nonexistent A. & P. lease, in consideration for Grand Union's agreement to a rent increase, by its letter of November 2, 1964, Grand Union rejected the proposal, and thereafter Levy and the corporations which he controlled proceeded without further communication to Grand Union.

It is true that the clearing of land and excavation began as early as November, 1964. Actual construction did not begin until April, 1965, when A. & P. executed its lease and, thereafter, foundations, the concrete slab for the first floor, and the erection of steel proceeded rapidly so that, on September 9, 1965, the date of Grand Union's formal notice of demand for enforcement of the restrictive covenant of which it was the beneficiary, all earth moving and foundations had been completed and sixty to sixty-five per cent of the required steel was erected. By that date approximately $90,000.00 had been paid to the building contractor. Suit was instituted October 7, 1965; no motion for a temporary restraining order was made.

Shortly after work was first started in April, 1965, a sign was erected on the premises indicating that Steward Village Shopping Center was being constructed. No mention was made, however, that a supermarket would be located in the shopping center, nor was mention made of any tenant or of any goods or services to be sold thereon and, indeed, Laurel Plaza had proposed the previous November that it would construct a shopping center without a supermarket if Grand Union agreed to a rent increase. Construction of the Grand Union supermarket did not start until December, 1964, and the supermarket was not completed and opened until November, 1965. The Court thus infers that Grand Union had no occasion to have any of its employees constantly at its supermarket who would have had an opportunity to observe the course of construction of the A. & P. supermarket until after suit was filed.

■ On July 16, 1965, one of Grand Union's Washington representatives called attention to the fact that construction was proceeding on the south side of Fort Meade Road. He was instructed to watch the situation carefully and to make an investigation of what was to be constructed. This representative sought access to the application for building permit for this site. He determined that no permit had been issued and that until a permit was issued the application therefor was not available as a matter of public record. The only indication which could be obtained from the public records at that time was that a building of 45,000 square feet was contemplated, with a 14,000 to 20,000 square foot basement area. This was not enough to indicate a supermarket. Confirmation that the shopping center included a supermarket came shortly thereafter, approximately the end of July, and Grand Union consulted Washington counsel in August, 1965.

The Court finds as facts the recitation stated above, and concludes that they fail to show any lack of diligence on the part of Grand Union causing prejudice to any of the defendants. The fact that work on

the A. & P. supermarket site had begun as early as November, 1964, and continued until Grand Union made actual inquiry about a building permit in July, 1965, was not enough to put Grand Union on notice that the restrictive covenant was about to be violated. As stated, Grand Union's store was not in operation, and Grand Union was not a constant observer of the progress of construction. A building permit had not been issued, and Grand Union had made its position known that it claimed the restrictive covenant to be applicable to the Steward Village Shopping Center, in which Laurel Plaza had apparently reluctantly concurred. The lapse of approximately ninety days between the time that Grand Union got actual notice that a building permit was applied for (without learning the purpose of the construction) and the time that suit was instituted was not an unreasonable period in which it, having home offices in New Jersey, could investigate the facts to confirm that a breach of the covenant was contemplated, refer the matter to counsel and obtain their opinion, make demand on Laurel Plaza and prepare and file suit. Nor was the lapse of less than sixty days after actual notice of what was happening and a formal demand that the covenant be enforced unreasonable delay. Similarly, institution of suit thirty days after formal demand showed no lack of diligence, the conclusion seems inescapable that Levy and the corporations he controlled, having begun construction of the Steward Village Shopping Center without a building permit, had embarked on a race to complete the A. & P. supermarket and to create equities in their favor, all to the end of justifying a breach of the restrictive covenant. The equitable doctrine of laches gives no warrant for such action. In any event, the Court finds as an ultimate fact that Grand Union did nothing to lull Levy and the corporations he controls into a belief that they had a right to proceed with the construction of the supermarket, and any prejudice to defendants which has resulted is not attributable to

any improper or unreasonable act or inaction on the part of Grand Union.

Grand Union is entitled to a declaration that the restrictive covenant prohibits the operation of a supermarket in the Steward Village Shopping Center and to injunctive relief against the defendants to prohibit such operation. Counsel may submit an agreed form of order, consistent with the views expressed herein, within ten (10) days.