**RED SAGE LIMITED PARTNERSHIP,** Appellant,

v.

**DESPA DEUTSCHE SPARKASSEN IMMOBILIEN--ANLAGE--GASELLS-CHAFT MBH,** *a/k/a* DespaEuropa, Appellee.

No. 00–7129.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 5, 2001.

Decided July 13, 2001.

Andrew J. Kline argued the cause for appellant. With him on the briefs was Jeffrey L. Berger.

J. Jonathan Schraub argued the cause for appellee. With him on the brief was Paige A. Levy.

Before: EDWARDS, Chief Judge, GINSBURG and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

A Washington, D.C. restaurant sought a declaration that its landlord breached an exclusive use covenant by renting space in the same building to a specialty cake shop. The restaurant claimed that under its lease, the breach entitled it to a 50 percent rent abatement. The district court granted summary judgment for the landlord, finding that under the circumstances of this case, a 50 percent rent abatement would constitute an unenforceable penalty. Because we conclude that the rent abatement, negotiated by sophisticated parties, was not an unreasonable estimate of the damages likely to result from a breach of the exclusive covenant, and because the landlord's additional arguments for summary judgment fail, we reverse and remand for further proceedings.

I

Red Sage Limited Partnership operates an "internationally known ... fine dining" restaurant in the Westory building, a Washington D.C. office building. Appellant's Opening Br. at 5. In the same building, Red Sage operates several private dining rooms used for catering and special events, a casual Tex–Mex restaurant, and the Red Sage Market, a take-out facility that sells sandwiches, salads, snacks, cold drinks, tea, coffee, and desserts, including a variety of whole cakes available by special order.

Red Sage first leased space in the Westory building in September of 1990. At that time, the building was owned by 607 14th Street Associates Limited Partnership. Insofar as the original landlord, through his wife, had an ownership interest in Red Sage, the original lease was not negotiated at arm's length. The lease provided that "[t]enant shall use and occupy the Leased Premises solely as a bar and/or

a restaurant." The lease also included the following exclusive covenant and penalty clause:

34. *Exclusive Covenant*

(a) To the extent permitted by law, Landlord covenants that during the Term it shall not permit any other tenant within the Building to operate a bar, restaurant or food service establishment of any kind (a "Competing Use"). The provisions of this Section 34 shall be enforceable only so long as Tenant is operating a bar and/or a restaurant in the Leased Premises.

. . .

(e) In the event that a Competing Use is operated in the Building at any time during the Term and Landlord has violated its covenants under this Section 34, then (i) one half (½) of the Base Rent payable hereunder shall be abated during the period that the Competing Use is operated in the Building, and (ii) Tenant may terminate this Lease if the operation of the Competing Use continues for a period of six (6) months after written notice thereof by Tenant to Landlord. . . . The provisions of this subsection (e) shall not limit . . . any other remedies which Tenant may have against Landlord for violating its obligations under this Section.

Six years later, in 1996, 14th Street Associates and Red Sage executed an Amended and Restated Lease. The amended lease contained the same exclusive covenant and penalty clause as the original lease, but included a revised tenant use provision:

Tenant use and occupancy of the Leased Premises shall consist of owning and operating a restaurant and bar and carrying on any and all activities incidental or related thereto, including, but not limited to, operating a retail general store primarily selling t-shirts, sweat-shirts, souvenirs, spices, baked goods, foods and other items related to Tenant's bar and restaurant.

The new lease also set base rent at "six and one-half percent . . . of [Red Sage's] Gross Revenues, but in no event less than Four Hundred Thousand Dollars." The parties do not dispute that this lease was executed at arm's length.

In 1997, in preparation for the sale of the Westory Building to DespaEuropa—Red Sage's current landlord and appellee in this case—14th Street Associates and Red Sage again amended the lease. This amendment left intact the tenant use, base rent, exclusive covenant, and penalty clause provisions in the amended lease, stating that "[a]ll terms and provisions of the Lease which are not amended hereby are hereby ratified and confirmed in all respects." Red Sage asserts that Despa was "actively involved" in negotiating the 1997 amendment, since "reformulation of the Red Sage Lease was a precondition to the purchase of the Westory Building by Despa." Appellant's Opening Br. at 6. For its part, Despa asserts that it "was not involved in any way in the negotiations for or the drafting of the Red Sage Lease, but rather inherited it as a second or third generation owner of the building." Appellee's Br. at 5. It is undisputed, however, that a Despa representative signed the 1997 amendment, endorsing it "Accepted and Agreed."

Later that year, Despa purchased the Westory building from 14th Street Associates and, the following year, leased space in the building to a specialty store known as Cakes & Company, triggering the dispute leading to this litigation. Cakes' original lease permitted it to operate a "bakery/cafe" selling "specialty cakes, baked goods, coffee, non-alcoholic beverages and associated paper goods," but as Red Sage concedes, Despa later amended the lease,

deleting the reference to operating a "cafe" and permitting Cakes to sell food items only for consumption off the premises. The parties agree that Cakes primarily sold whole cakes—prepared elsewhere and decorated on-site—for weddings and special occasions. It also sold tea, coffee, single slices of cake, and some of the same prepackaged drinks sold by Red Sage Market. Cakes had no menu, wait staff, or customer tables or chairs. In Cakes' first four months of operation, its gross sales were almost $95,000, its gross profits around $50,000, and its net income about $11,000.

Learning of the lease to Cakes, Red Sage wrote to Despa, asserting that the landlord was violating the exclusive covenant in Red Sage's lease and requesting a 50 percent rent abatement. Despa replied: "The exclusive right you currently enjoy in your lease ... pertains to a competing 'food service operation.' Cakes & Company could not infringe upon the highly stylized and critically acclaimed Red Sage." Letter from Laurie McMahon, Director of Downtown Property Management, Cassidy & Pinkard Property Services L.L.C., to Bo Nilsson, Managing Partner, Red Sage, Inc. (May 26, 1998).

Red Sage then sued Despa in the Superior Court for the District of Columbia, seeking a declaration that Despa "has breached and continues to breach section 34 of the Lease, [and] that as a result of this breach Red Sage is entitled to an abatement of one-half of the Base rent...." Compl. for Declaratory Relief, *Red Sage Ltd. P'ship v. DESPA mbH*, No. 98ca007066, at 6 (D.C.Super. Ct. Sept. 16, 1998). Despa removed the case to federal court, and both parties moved for summary judgment, contending that there were no disputed issues of material fact. The district court denied the motions, stating that "the contractual term 'food service establishment' is not susceptible to defini-

tive construction as a matter of law under either the ... Lease or the Municipal Regulations of the District of Columbia," and that there were "material questions of fact concerning: 1) the parties' intentions as to the scope and coverage of the restrictive covenant ... and 2) the exact nature of the 'services' provided by Cakes." Order Den. Cross-mot. for Summary J., *Red Sage Ltd. P'ship v. DESPA mbH*, No. 98–2533 (D.D.C. Sept. 8, 1999).

At a subsequent status conference, Despa renewed its motion for summary judgment on the alternative ground that the rent abatement provision in Red Sage's lease constituted an unenforceable penalty. Following supplemental briefing on the issue, the district court granted Despa's motion for summary judgment, finding that since "a rent abatement of $200,000 ... would indeed impose an improper penalty," Despa was entitled to judgment as a matter of law. *Red Sage Ltd. P'ship v. DESPA mbH*, No. 98–2533, Mem. Op. at 1–2 (D.D.C. Feb. 15, 2000), *recon. denied, Red Sage Ltd. P'ship v. DESPA mbH*, No. 98–2533 (Apr. 11, 2000).

At some point following the grant of summary judgment, Cakes closed its shop in the Westory building and terminated its lease with Despa. The dispute in this case thus concerns the value of the abatement for the period during which Cakes operated. "We review a grant of summary judgment de novo, applying the same standard as the district court. Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *D.C. Hosp. Ass'n v. Dist. of Columbia*, 224 F.3d 776, 779 (D.C.Cir. 2000) (internal citations omitted).

II

We begin with a threshold issue: Red Sage urges us to treat the rent abatement

provision not as a liquidated damages clause, but rather as a contractual provision adjusting rent in response to changed conditions. Noting that parties to a lease sometimes agree in advance that rent will change upon the occurrence of future conditions, *see, e.g., Collins v. Sears Roebuck & Co.*, 164 Conn. 369, 321 A.2d 444, 449 (1973), Red Sage argues that the rent abatement provision here reflects the parties' understanding that "the premises leased by Red Sage" would be "less valuable to Red Sage if there exist[ed] [another] bar, restaurant, or food service establishment in the [b]uilding." Appellant's Opening Br. at 15. Acting on this understanding, the parties "provided for a partial abatement of base rent in the event a Competing Use is operated in the building." *Id.* at 14, 321 A.2d 444. "[N]ot knowing the precise nature of the ... food service establishment which might some day be located in the Building," they "predetermined" that a competing use would diminish the "value of Red Sage's premises" by "one half of the Base Rent." *Id.* at 15, 321 A.2d 444. The abatement provision, Red Sage argues, is "no different than provisions in leases for increased rental in the event of a holdover tenancy, which are routinely enforced even if the increased rental is three, four or even five times the normal rental rate." *Id.* at 14, 321 A.2d 444.

■ This argument requires little discussion. Under D.C. law, "the written language of a contract governs the parties' rights unless it is not susceptible of clear meaning." *Adler v. Abramson*, 728 A.2d 86, 88 (D.C.1999). Here, we think it clear from the language of the contract that the rent abatement provision was a liquidated damages clause, not a rent adjustment. To begin with, the clause states both that "[r]ent ... shall be abated" if the landlord "*violate[s]*" the exclusive covenant and that the rent abatement "shall not limit ... any other *remedies* which Tenant may have

against Landlord for violating its obligations under this Section" (emphasis added). This language strongly suggests that the rent abatement is a "remed[y]" for a "viola[tion]" of the lease, rather than a mere adjustment for changed circumstances. Reinforcing this conclusion, the provision allows Red Sage not only to abate its rent if the exclusive lease covenant is violated, but also to "terminate [its] lease if the operation of the Competing Use continues for a period of six ... months after written notice thereof by Tenant to Landlord." The possibility of termination is in some tension with the notion of a rent adjustment, since it contemplates not an ongoing landlord-tenant relationship under different terms, but an end to the relationship altogether. Finally, Red Sage's analogy to tenant holdover cases actually undermines its argument: while Red Sage does cite one case from another jurisdiction treating a double rent provision for holdover tenants as a simple rent adjustment, *First Capital Institutional Real Estate, Ltd. v. Pennington*, 186 Ga.App. 617, 368 S.E.2d 165 (1988), the District of Columbia case it cites treats a similar provision as a liquidated damages clause. *Sanchez v. Eleven Fourteen, Inc.*, 623 A.2d 1179 (D.C.1993); *see also Horn & Hardart Co. v. Nat'l R.R. Passenger Corp.*, 659 F.Supp. 1258, 1266–68 (D.D.C.1987) (analyzing triple rent holdover provision as liquidated damages clause).

We thus turn to Red Sage's main argument: that, assuming the rent abatement provision is a liquidated damages clause, it is valid and enforceable. In reaching a contrary conclusion, the district court invoked the principle that "[i]f there is doubt as to whether the parties intended to provide for legitimate liquidated damages, courts routinely construe liquidated damages provisions as penalties" and thus decline to enforce them "to prevent forfeitures." *Red Sage*, No.98–2533, at 4

(D.D.C. Feb. 15, 2000) (citing *Goldman v. Conn. Gen. Life Ins. Co.*, 251 Md. 575, 248 A.2d 154, 158 (1968)). In applying this principle, the court neither developed an evidentiary record of nor relied on extrinsic evidence regarding the parties' intent. *Cf. Farmland Indus., Inc. v. Grain Bd. of Iraq*, 904 F.2d 732, 736 (D.C.Cir. 1990) ("When the meaning of a contract provision is facially uncertain, a court may resort to an examination of extrinsic evidence, such as statements, course of conduct, and contemporaneous correspondence, aimed at discerning the intent of the parties."). Instead, the court found "considerable doubt" about the parties' intentions regarding the rent abatement clause for two other reasons. *Red Sage*, No. 98–2533, at 4 (D.D.C. Feb. 15, 2000). First, "[t]he absence of arms length negotiation undercuts the ordinary presumption that the language on which the contracting parties have agreed accurately reflects their intent." *Id.* Second, since "Red Sage Market ... did not exist when the lease was written," even if the rent abatement clause represented a "reasonable effort" by the parties to estimate damages from breach of the exclusive covenant, that estimate "obviously related to ... competition from a substantial 'food service establishment,' and not from a small operation that would not compete with Red Sage's principal business of operating a restaurant." *Id.* at 4–5. Thus finding that the parties had not clearly intended to provide for liquidated damages in a case like this, the court construed the rent abatement as a penalty and refused to enforce it.

■ Challenging this analysis, and noting that summary judgment is inappropriate "if extrinsic evidence supports more than one reasonable interpretation of [a] contract," *Farmland Indus.*, 904 F.2d at 736, Red Sage points out that it submitted an affidavit from the drafter of the original lease stating that the rent abatement pro-

vision was intended to estimate damages from breach of the exclusive covenant. It also points out that the same affidavit, while acknowledging that Red Sage Market did not exist at the time of the lease drafting, made clear that *none* of Red Sage's businesses was operating at that time, and that *all* aspects of its operation, including the Market, were contemplated by the parties. Appellant's Opening Br. at 19–22.

■ We need not resolve this aspect of Red Sage's challenge to the district court's decision, however, because both the district court's reasoning and Red Sage's responses concern the original 1990 lease negotiated between 14th Street Associates and Red Sage, and as we read the record, Red Sage's dispute with Despa concerns the 1997 amended lease. Unlike the 1990 lease, the later lease was negotiated at arms length, and Red Sage Market was operating in 1997. We therefore consider for the first time whether the rent abatement provision in the 1997 amended lease was a penalty clause, focusing in the first instance on its plain language. *See Adler*, 728 A.2d at 88.

■ In *Davy v. Crawford*, 147 F.2d 574 (D.C.Cir.1945), this court set out standards for deciding whether a liquidated damages provision is an unenforceable penalty under District of Columbia law. Because of its importance to this case, we quote the relevant passage in full:

> [T]he parties to a contract may agree in advance to a sum certain which shall be forfeited as liquidated damages for breach of the contract without reference to the actual damages found at the time of the breach. But if such an agreement is for a penalty it is void. In order to determine whether or not the provision should be construed as a penalty the contract must be construed as a whole as of the date of its execution. If under

the circumstances and expectations of the parties existing at the time of execution it appears that the provision is a reasonable protection against uncertain future litigation the provision will be enforced even though no actual damages were proved as of the date of the breach. If, on the other hand, it appears that the stipulation is designed to make the default of the party against whom it runs more profitable to the other party than performance would be, it will be void as a penalty. Thus, damages stipulated in advance should not be more than those which at the time of the execution of the contract can be reasonably expected from its future breach, and agreements to pay fixed sums plainly without reasonable relation to any probable damage which may follow a breach will not be enforced.

*Davy*, 147 F.2d at 575 (citations omitted). The D.C.Code governing leases, enacted many years after *Davy*, sets forth essentially the same standard: "Damages payable by either party for default ... may be liquidated in the lease agreement, but only at an amount or by a formula that is reasonable in light of the then anticipated harm caused by the default ...." D.C.CODE ANN. § 28:2A–504(a).

 Applying these· standards, we think the rent abatement provision in the 1997 amended lease is valid as a matter of law. To begin with, as Red Sage claims, at the time the lease was signed, the parties could reasonably have believed the damages resulting from a breach of the exclusive covenant would be difficult to ascertain, rendering future litigation "uncertain." *Davy*, 147 F.2d at 575; *see also Barnette v. Sayers*, 289 F. 567, 570 (D.C.Cir.1923) ("Uncertainty in amount and difficulty of ascertainment of damages are regarded as supporting the view that a contract provides for liquidated damages rather than a penalty ...."). Disagreeing with this conclusion, Despa

suggests that damages to Red Sage's restaurant business from a competing food service establishment would have been easy to calculate by analyzing overhead and table turnover to derive the value of lost sales. As Red Sage points out, however, even if it could demonstrate a decline in sales, "isolat[ing] the new competitor as the sole reason for the decline" would be "almost impossible," making damages difficult to prove. Appellant's Reply Br. at 2. Moreover, "[l]ost sales do not represent the only damages potentially arising from competition.... [D]amages may take the form of lost opportunities whereby the new competitor, instead of having an impact on existing sales, affects the restaurant's ability to increase sales." *Id.* at 2–3. Damages might also include a variety of intangible losses such as lost goodwill, which would likewise be difficult to calculate and prove.

We also cannot say that the abatement is "plainly without reasonable relation to any probable damage which may follow a breach." *Davy*, 147 F.2d at 575. Despa disagrees, arguing that it would have been unreasonable to think the damages resulting from Cakes' competition with Red Sage Market—which the lease describes as an "incidental use" and which produces only a small portion of Red Sage's total income—would amount to 50 percent of its rent for *all* its operations, especially in view of the fact that the same measure of damages would apply to competition from a large-scale operation such as another bar and restaurant. The question before us, however, is not whether a 50 percent rent abatement would have been a reasonable estimate of anticipated damages from a competitor on the scale of Cakes. We read the exclusive covenant as intending to ensure that Red Sage will be the only "bar, restaurant[,] or food service establishment of any kind" in the Westory

building: as Red Sage put it in its motion for summary judgment, the purpose of the covenant was to "prevent[ ] another destination restaurant from opening in the Westory Building" and "to prevent[ ] the location of another food service business in the Westory Building to service the office tenants." Plaintiff's Motion for Summary Judgment, *Red Sage Ltd. P'ship v. Despa mbH,* No. 98–2533 at 14 (D.D.C. June 15, 1999). The rent abatement provision sets damages for a breach of this covenant, and such a breach could involve a wide variety of competing uses giving rise to a wide range of possible damages. The question we must ask is thus whether a 50 percent reduction in base rent was reasonable as a single formula intended to estimate damages from a wide variety of possible competing uses.

Although it is true, as Red Sage itself acknowledges, that the parties might well have anticipated that damages from a competitor like Cakes would probably be less than 50 percent of base rent ($200,000 in this case), the parties might also have anticipated that damages from a competing restaurant would be considerably greater than this amount. (Though its net income was not especially high, Red Sage's annual gross income in a recent year was around $6.5 million.) Accordingly, as a single formula designed to capture the expected value of damages from breach of the exclusive covenant, we cannot say that half of base rent was unreasonable as a matter of law.

■ Nor do we think the rent abatement provision "appears ... designed to *make the default of the party against* whom it runs more profitable to the other party than performance would be." *Davy,* 147 F.2d at 575. Although in this case the rent abatement clause might well result in Red Sage receiving more than it actually lost as a result of Cakes' competition, the clause might significantly underestimate Red Sage's damages in other circum-

stances, such as if the landlord were to rent space to another upscale, full-service restaurant. In other words, the provision does not guarantee Red Sage a certain windfall in case of a breach. *Cf. Raffel v. Medallion Kitchens of Minn., Inc.,* 139 F.3d 1142, 1144–46 (7th Cir.1998) (invalidating as a penalty a lease provision requiring tenant to pay a "windfall" equivalent to seven months' rent if rent was more than thirty days late).

Despa's strongest argument is that the very use of a single formula to capture such a wide range of damages renders the clause unenforceable. Because the rent abatement provision "applies to a variety of types of defaults, each of which could have vastly differing degrees of damages associated with them," Despa urges us to declare it "null and void, under the reasoning that there could not have been a good faith attempt to pre-estimate possible · damages, since the real and obvious possibility existed that the damages provided for would turn out to be excessive." Appellee's Br. at 18–19; *see generally* 5 CORBIN ON CONTRACTS § 1066 (1964). In support of this claim, Despa relies on *Davy,* which involved a lease for a house. Under the lease, the tenant had an option to purchase at the end of a fixed rental period. The lease required a "down payment," which it described as "compensation for the option to purchase and also liquidated damages for failure to exercise it." *Davy,* 147 F.2d at 575. But the lease also provided that the down payment (together with any accumulated equity in the house) would be forfeited for breach of "any covenant" in the lease, including such things as promises to pay gas, electric, and water bills on time. The court found that the forfeiture provision was an unenforceable penalty in part because the damages applicable to a major breach—failure to exercise the option to purchase—would also have applied to a "minor and insubstantial

default" on the part of the breaching party. *Davy*, 147 F.2d at 575. According to Despa, the same is true here: under Red Sage's interpretation of the lease, the 50 percent abatement applies whether the "competing use" is a small-scale operation like Cakes that competes incidentally with Red Sage, or a full-scale restaurant competing directly with Red Sage's principal businesses.

■■■ This case, however, differs from *Davy* in at least four significant ways. First, the provision at issue in *Davy* called for forfeiture of a fixed sum regardless of the nature of the breach. *Davy*, 147 F.2d 574; *cf. Raffel*, 139 F.3d at 1142 (stating that liquidated damages clauses are penalties where, among other things, "the amount of the damages is *invariant* to the gravity of the breach") (emphasis added); 5 CORBIN ON CONTRACTS § 1066, at 379 (characterizing contracts that make "*one sum of money* ... payable as damages for any breach whatever" as penalty clauses) (emphasis added). The rent abatement provision at issue here, in contrast, does not set damages as a single sum: because the provision applies only as long as a competing use is present, damages will vary with the duration of the competing use. Second, the provision at issue in *Davy* appears to have been one-sided: the down payment would have been forfeited for failure to exercise the option, or for a variety of smaller breaches, but never, it seems to us, in a situation that would have disadvantaged the landlord. *Cf. Raffel*, 139 F.3d at 1146 (because a 10 percent late fee fully compensated a landlord for the effect of late rent payments, an additional fine when rent was more than thirty days late "ensure[d] the lessor more than his actual damages" and was therefore invalid). Here, because the rent abatement clause could just as easily have under- as over-estimated actual damages, the provision appears not to have been intended to penalize Despa. Third—and closely relat-

ed—the court in *Davy* found the lease as a whole, including both the liquidated damages provision and other parts of the contract, to have an "unconscionable and overreaching character" that heavily favored the landlord at the expense of the tenant. *Davy*, 147 F.2d at 575. Here, neither party claims that the lease as a whole is unconscionable and overreaching. Finally, and perhaps most important, the agreement in *Davy* appears to have involved a corporate landlord and a private individual. *See id.* at 574 ("Action by Beatrice I. Crawford and others against Myron Davy and others, trading as River Terrace Company...."). The rent abatement provision in Red Sage's lease, in contrast, was negotiated by sophisticated parties, and District of Columbia courts, as well as Maryland courts, to which District of Columbia courts often look for guidance, *see GEICO v. Fetisoff*, 958 F.2d 1137, 1143 (D.C.Cir. 1992), are generally reluctant to disturb terms agreed upon by such parties. *See, e.g., District of Columbia v. C.J. Langenfelder & Son, Inc.*, 558 A.2d 1155, 1163 (D.C.1989) (rejecting the view that the phrase "equitable adjustment" in a contract gave the court "roving discretion to reform the contracts of informed and sophisticated parties"); *Mass Transit Admin. v. CSX Transp., Inc.*, 349 Md. 299, 708 A.2d 298, 309 (1998) ("A decent respect for the freedom of sophisticated parties contractually to establish the rules governing their business relationship compels the conclusion that the [Maryland] General Assembly intended contracting parties to be able to determine, when they contract, whether [a statutory provision] applies to their agreement."); *Mattvidi Assocs. Ltd. P'ship v. NationsBank of Va.*, 100 Md. App. 71, 639 A.2d 228, 239 (Md. Ct. Spec. App.1994) ("When two commercially sophisticated parties freely enter into an agreement containing a late charge clause ... it seems entirely appropriate that the

burden of proof should be on the party who later claims that the clause is invalid.").

█ All liquidated damages clauses, if implemented in situations where damages are difficult to estimate, will generally end up either over- or under-estimating actual damages. And while the range of possible damages in this case is quite wide, the parties may have had good reason for wanting a broad exclusive use covenant: for example, they may have wished to ensure expansive protection for Red Sage's food service operations. The parties may also have had good reason for wanting a single formula for calculating damages from a breach of the exclusive covenant: they may have worried that specifying different levels of damages to cover different levels of breach could have enmeshed them in time-consuming and expensive disagreements over which damages applied to a particular breach. We do not know exactly why the parties agreed to this particular clause, nor is it our role to discern their precise intentions. Because the provision is neither obviously one-sided nor obviously intended to impose a penalty that would coerce performance, because the actual estimate is not clearly unreasonable in relation to the range of possible damages, and because both parties are sophisticated businesses, we find that as a liquidated damages clause covering operations of the scale of Cakes and larger, the rent abatement provision in Red Sage's lease is enforceable as a matter of law. *See Langenfelder*, 558 A.2d at 1163; *see also id.* at 1169 (dissenting opinion) ("I agree with my colleagues that judges have no roving commission to relieve sophisticated parties of their contractual obligations.").

## III

In its original motion before the district court, Despa suggested two additional bases for summary judgment: (1) on its face, the phrase "food service establishment" excludes Cakes; and (2) if the phrase covers Cakes, the exclusive covenant is an unreasonable restraint of trade. According to Despa, because the actual *order* accompanying the district court's summary judgment opinion did not specify the grounds for decision, the court implicitly accepted the additional arguments in Despa's original motion, and since Red Sage's opening appellate brief addressed only the penalty clause issue, and not the two alternate theories, Red Sage has conceded those arguments.

This argument is absurd. Quite apart from the fact that the district court rejected Despa's original motion for summary judgment and awarded relief only after ordering supplemental briefing on the penalty clause issue, the court's opinion makes abundantly clear that it awarded summary judgment only because it decided the rent abatement provision was an unenforceable penalty. The three citations Despa invokes for the proposition that courts "speak[ ] only by [their] orders"—one of which is to a dissenting opinion, another of which is to an unpublished decision—concern instances where orders conflict directly with other court documents. *See Shafer v. Children's Hosp. Soc. of L.A.*, 265 F.2d 107, 117 (D.C.Cir.1959); *Flannigan v. Consol. Rail Corp.*, 888 F.2d 127, 1989 WL 130634 (6th Cir.1989); *Murdaugh Volkswagen, Inc. v. First Nat'l Bank of S.C.*, 741 F.2d 41, 44 (4th Cir. 1984). Those citations thus have no bearing on this case. Because Despa has reasserted its alternate arguments for summary judgment before this court, however, and because Red Sage has responded in its reply brief, we consider whether these arguments provide an alternate basis for sustaining summary judgment for Despa. *See In re Swine Flu Immunization Prods. Liab. Litig.*, 880 F.2d 1439, 1444 (D.C.Cir. 1989) (stating that this court may affirm a

district court's grant of summary judgment on grounds not relied upon by that court).

■ First, Despa argues that as a matter of law, the phrase "food service establishment of any kind" in the exclusive use covenant does not cover Cakes. Under District of Columbia law, as we have already noted, "the written language of a contract governs the parties' rights unless it is not susceptible of clear meaning." *Adler*, 728 A.2d at 88. "In deciding whether contract language has a clear meaning, the court asks what a reasonable person in the position of the parties would have thought the disputed language meant." *Id.* (internal quotations omitted). "When the meaning of a contract provision is facially uncertain, a court may resort to an examination of extrinsic evidence, such as statements, course of conduct, and contemporaneous correspondence, aimed at discerning the intent of the parties." *Farmland Industries*, 904 F.2d at 736.

Here, the plain language of the lease—"food service establishment of any kind"—could well describe a business like Cakes. As Red Sage argues, the modifier "any" suggests that the parties intended the provision to be read broadly. In addition, the lease specifies that its terms are to be construed according to District of Columbia law, and District regulations define the similar phrase "food service operation" to include businesses in which "food is prepared for service and consumption elsewhere." D.C. MUN. REGS. tit. 23, § 2499.

Other features of the lease, however, indicate that the parties may have intended the exclusive covenant to have a narrower reach. The covenant refers to "restaurant[s], bar[s], or food service establishment[s] of any kind" as "competing use[s]," suggesting that the purpose of the clause was to prevent competition with Red Sage. This in turn suggests that an establishment that sold food but did not compete with Red Sage in any way—a store selling freeze-dried camping food, for example—might not fall within the covenant's reach. In addition, the fact that the exclusive covenant applies only so long as Red Sage operates a "bar and/or restaurant" could mean that it excludes only food service operations that compete with Red Sage's restaurants, not those that compete with "incidental" uses like the Red Sage Market.

We thus think the language of the contract is unclear. Beyond the lease itself, we have no factual record regarding the 1997 parties' understanding of the phrase "food service establishment of any kind." And if in fact that understanding has something to do with protecting Red Sage from competition, there are (as the district court found) disputed issues of fact regarding the exact nature of Cakes' business and its degree of competitive overlap with Red Sage market. The parties disagree, for example, about the degree to which Cakes targeted its services to office workers in the Westory building: while Red Sage asserts that Cakes "under[took] special efforts to market cake[ ] and coffee as a snack combination," Appellant's Opening Br. at 9, Despa asserts that Cakes "did not advertise any on-premises food service or sales." Appellee's Br. at 8. Summary judgment would thus be inappropriate on the question of whether the exclusive covenant covers Cakes. *See D.C. Hosp. Ass'n*, 224 F.3d at 779.

■ Despa also argues that if Cakes is a "competing use" within the meaning of the exclusive use covenant, that provision amounts to an unreasonable restraint of trade. In the District of Columbia, covenants restricting competition are valid if ancillary to some other legitimate interest. *See Ellis v. James V. Hurson Assocs.*, 565 A.2d 615, 618 (D.C.1989). Here, the exclusive covenant is ancillary to the landlord-tenant relationship between

Red Sage and Despa. Such covenants, however, are invalid if they are "greater than is needed to protect the promisee's legitimate interest." RESTATEMENT (SECOND) OF CONTRACTS § 188(1) (1981) [hereinafter RESTATEMENT] (quoted in *Venture Holdings, Ltd. v. Carr*, 673 A.2d 686, 689 n. 4 (D.C.1996)). Here, Despa argues that the exclusive use covenant, assuming it prohibits the lease to Cakes, restrains more trade than is reasonable because competition from Cakes was at best incidental to Red Sage. If the covenant covers Cakes, Despa concludes, it amounts to a complete prohibition on any competition whatsoever, and a promise to "refrain altogether from competition" "implicates the common law policy against unreasonable restraints of trade." *Venture Holdings*, 673 A.2d at 689.

The District of Columbia has "adopted the common law principles regarding promises in restraint of trade[ ] as reported in the *Restatement (Second) of Contracts*." *Venture Holdings*, 673 A.2d at 689. "Comment d" to the *Restatement* provides that the extent of a restraint on competition may be limited in three ways: by geographical area, time, and type of activity. RESTATEMENT § 188 cmt. d. Here, the covenant is restricted in all three ways: it applies only to the Westory building; it lasts only the length of the lease; and rather than preventing all retail activities, it prevents only food service activities. The discussion in *Venture Holdings* on which Despa relies is not to the contrary: that case concerned a far more sweeping promise by a former employee not to "engage in business competition" of any kind with his former employer. *See*

673 A.2d at 689. As the *Restatement* suggests, "[p]ost-employment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood." RESTATEMENT § 188 cmt. g. Not only are similar considerations inapplicable here, but courts have previously enforced lease provisions like the one at issue in this case. *See, e.g., Grand Union Co. v. Laurel Plaza, Inc.*, 256 F.Supp. 78, 81 (D.Md.1966) (enforcing a lease provision making a supermarket the sole retailer of food to be consumed off-premises in a shopping mall). We thus conclude that the exclusive covenant in Red Sage's lease is not an unreasonable restraint of trade.

## IV

In sum, we find that as a matter of law, the rent abatement provision would constitute neither an unenforceable penalty nor an unreasonable restraint of trade as applied to Cakes. Because we agree with the district court that the phrase "food service establishment of any kind" cannot be definitively construed as a matter of law, we remand to the district court to determine whether, in light of the contract's language, the parties' intent, and the nature of Cakes' operation, Despa's lease to Cakes entitles Red Sage to a rent abatement.

*So ordered.*